TIMOTHY H. CRAIG, AND THE CHATHAM COUNTY AGRIBUSINESS COUNCIL v. COUNTY OF CHATHAM, CHATHAM COUNTY HEALTH DEPARTMENT AND THE CHATHAM COUNTY BOARD OF HEALTH

No. 270PA01

(Filed 28 June 2002)

**1. Counties; Public Health— local ordinance—swine farms—health rules—preemption by state law**

The Court of Appeals did not err by concluding that state law preempts the regulation of swine farms and thus prevents county commissioners and a local board of health from adopting an ordinance and rules regulating swine farms, because: (1) North Carolina's swine farm regulations, the Swine Farm Siting Act, and

CRAIG v. COUNTY OF CHATHAM

[356 N.C. 40 (2002)]

the Animal Waste Management Systems statutes, are so comprehensive in scope that the General Assembly must have intended that they comprise a complete and integrated regulatory scheme on a statewide basis leaving no room for further local regulation; and (2) county commissioners and local boards of health have no authority under N.C.G.S. § 130A-39(b) to superimpose additional regulations without specific reasons clearly applicable to a local health need.

**2. Zoning— local ordinance—swine farms—validity**

The Court of Appeals erred by upholding a local zoning ordinance relating to swine farms, because: (1) the ordinance seeks to impose regulations on swine farms where the State has shown an intent to cover the field of swine farm regulation; and (2) the zoning ordinance's attempt to incorporate the invalid county swine ordinance prevents it from being valid.

**3. Zoning— local ordinance—regulation of swine farms**

The Board of Health may not regulate swine farms under N.C.G.S. § 130A-39 upon considerations other than health.

On discretionary review pursuant to N.C.G.S. § 7A-31 of a decision of the Court of Appeals, 143 N.C. App. 30, 545 S.E.2d 455 (2001), affirming in part and reversing and remanding in part an order for summary judgment entered 25 October 1999 by Allen (J.B., Jr.), J., in Superior Court, Chatham County. On 16 August 2001, the Supreme Court allowed plaintiffs' conditional petition for discretionary review as to an additional issue. Heard in the Supreme Court 14 November 2001.

*Ward and Smith, P.A., by Kenneth R. Wooten and Frank H. Sheffield, Jr., for plaintiff-appellants and -appellees.*

*The Brough Law Firm, by G. Nicholas Herman and Michael B. Brough, for defendant-appellants and -appellees.*

*Southern Environmental Law Center, by Donnell Van Noppen III and Michelle B. Nowlin; and Environmental Defense, by Daniel J. Whittle, on behalf of North Carolina Association of Health Board Directors; Environmental Defense; and Conservation Council of North Carolina, Inc., amici curiae.*

*Carlton Law Firm, by J. Phil Carlton on behalf of North Carolina Agribusiness Council, North Carolina Pork Producers*

CRAIG v. COUNTY OF CHATHAM

[356 N.C. 40 (2002)]

*Council, North Carolina Cattlemen, North Carolina Farm Bureau, North Carolina Poultry Federation, North Carolina State Grange, and the North Carolina Citizens for Business and Industry, amici curiae.*

*Nicolette G. Hahn on behalf of Waterkeeper Alliance, Cape Fear Riverkeeper, Neuse Riverkeeper, Neuse River Foundation, New Riverkeeper, Winyah Rivers Foundation, and the Alliance for a Responsible Swine Industry, amici curiae.*

LAKE, Chief Justice.

The issues raised here on review require the interpretation of the North Carolina General Statutes and application of North Carolina case law governing the question of preemption of county ordinances by the State. Specifically, the primary issues presented, defendants' first and second issues, relate to the validity of two Chatham County ordinances passed by the Chatham County Board of Commissioners and certain rules passed by the Chatham County Board of Health, all regulating swine farms.

On 6 April 1998, the Chatham County Board of Commissioners enacted the "Chatham County Ordinance Regulating Swine Farms" (the Swine Ordinance) and "An Ordinance to Amend the Chatham County Zoning Ordinance to Provide for Regulation of Swine Farms" (the Zoning Ordinance). The Swine Ordinance regulates swine farms "raising 250 or more animals of the porcine species," through a permitting system which affects currently existing farms and those which expand in the future. The Swine Ordinance is applicable to all such swine farms without regard to whether the farm is served by an animal waste management system having a design capacity of 600,000 pounds "steady state live weight"[1] or greater. Under the Swine Ordinance, the owners of swine farms are assigned the financial responsibility for future contaminations that might occur, which responsibility is ensured through both a written agreement with the Chatham County Health Department and some form of financial security. The Swine Ordinance also provides requirements for setback[2]

---

1. Steady State Live Weight (SSLW) is the "average day to day total live weight of any animal on the farm during their growth cycle." 2 Ted Feitshans et al., *Swine Farm Zoning Notebook* 726 glossary (2000) [hereinafter Feitshans, *Zoning Notebook*].

2. Setbacks are "[s]pecific distances that a structure or area must be located away, from other defined areas or structures." Feitshans, *Zoning Notebook*, at 726.

distances and buffer[3] zones for farms and sprayfields,[4] and semiannual testing of wells on the farm.

The Zoning Ordinance is applicable only to swine farms that are "served by an animal waste management system having a design capacity of 600,000 pounds steady state live weight (SSLW) or greater." The Zoning Ordinance limits swine farms to areas of the county which are zoned either "Light Industrial" or "Heavy Industrial." The Zoning Ordinance further requires the swine farmer to obtain a conditional use permit, with issuance contingent upon a showing of compliance with the Swine Ordinance.

On 28 April 1998, the Chatham County Board of Health enacted the "Chatham County Board of Health Swine Farm Operation Rules" (Health Board Rules), which apply to all swine farms[5] raising "250 or more animals of the porcine species," without regard to the design capacity of the farm's animal waste management system. The Health Board Rules are virtually identical to the Swine Ordinance.

On 2 September 1998, Timothy H. Craig and the Chatham County Agribusiness Council (CCAC) filed a complaint against defendants in superior court seeking a declaration that the Swine Ordinance, Zoning Ordinance and Health Board Rules were not legally valid. On 2 September 1999, CCAC filed a motion for partial summary judgment, and in September 1999, defendants filed an answer and a motion for summary judgment. The trial court granted defendants' motion for summary judgment and denied CCAC's motion for partial summary judgment. Plaintiffs appealed to the Court of Appeals, which affirmed in part and reversed in part the ruling of the trial court, holding that the Health Board Rules and the Swine Ordinance are preempted by state law but holding that the trial court was correct in granting summary judgment to defendants as to the Zoning Ordinance. This Court subsequently allowed defendants' petition for discretionary review and plaintiffs' conditional petition for discretionary review as to an additional issue.

---

3. Buffers are "[d]esignated areas of land around which agricultural activities may be prohibited or subject to restrictions." Feitshans, *Zoning Notebook*, at 721.

4. A sprayfield is an "[a]rea of land over which liquid animal wastes may be sprayed for disposal of those wastes." Feitshans, *Zoning Notebook*, at 726.

5. The Health Board Rules apply to a "swine farm" and the rules define a "swine farm" as "any tract or contiguous tracts of land in Chatham County under common ownership or control which is devoted to raising 250 or more animals of the porcine species."

**[1]** Defendants first contend that the Court of Appeals erred in concluding that state law preempts the regulation of swine farms and thus prevents county commissioners and a local board of health from adopting an ordinance and rules regulating swine farms.

The enactment and operation of a general, statewide law does not necessarily prevent a county from regulating in the same field. However, preemption issues arise when it is shown that the legislature intended to implement statewide regulation in the area, to the exclusion of local regulation. *See* N.C.G.S. § 160A-174(b)(5) (2001). " '[M]unicipal by-laws and ordinances must be in harmony with the general laws of the State, and whenever they come in conflict with the general laws, the by-laws and ordinances must give way.' " *State v. Williams*, 283 N.C. 550, 552, 196 S.E.2d 756, 757 (1973) (quoting *Town of Washington v. Hammond*, 76 N.C. 33, 36 (1877)). The law of preemption is grounded in the need to avoid dual regulation. *See, e.g., id.* at 554, 196 S.E.2d at 759.

Counties are creatures of the General Assembly and have no inherent legislative powers. *High Point Surplus Co. v. Pleasants*, 264 N.C. 650, 654, 142 S.E.2d 697, 701 (1965); *DeLoatch v. Beamon*, 252 N.C. 754, 757, 114 S.E.2d 711, 714 (1960). They are instrumentalities of state government and possess only those powers the General Assembly has conferred upon them. *Harris v. Board of Comm'rs of Washington Cty.*, 274 N.C. 343, 346, 163 S.E.2d 387, 390 (1968); *High Point Surplus*, 264 N.C. at 654, 142 S.E.2d at 701. Hence, we look to the North Carolina General Statutes to see what powers the General Assembly has delegated broadly to counties on a statewide basis or more specifically to counties such as Chatham in the area of swine farm regulation.

The General Assembly, in N.C.G.S. § 153A-121, has delegated to counties the power and authority to enact ordinances. That statute provides in part:

> (a) A county may by ordinance define, regulate, prohibit, or abate acts, omissions, or conditions detrimental to the health, safety, or welfare of its citizens.

N.C.G.S. § 153A-121(a) (2001). However, N.C.G.S. § 160A-174, as interpreted and applied by our case law, provides limitations on the exercise of this power. The relevant portions of N.C.G.S. § 160A-174 state:

> (b) A city ordinance shall be consistent with the Constitution and laws of North Carolina and of the United States. An ordi-

nance is not consistent with State or federal law when:

. . . .

> (5) The ordinance purports to regulate a field for which a State or federal statute clearly shows a legislative intent to provide a complete and integrated regulatory scheme to the exclusion of local regulation.

This Court has held that N.C.G.S. § 160A-174 is applicable to counties as well as cities. *State v. Tenore*, 280 N.C. 238, 185 S.E.2d 644 (1972).

N.C.G.S. § 130A-39 delegates power to the local board of health to

> adopt a more stringent rule in an area regulated by the Commission for Health Services or the Environmental Management Commission where, in the opinion of the local board of health, a more stringent rule is required to protect the public health.

N.C.G.S. § 130A-39(b) (2001). The Commission for Health Services and the Environmental Management Commission (EMC) are state agencies. The governor appoints all members serving on the EMC and a majority of the members serving on the Commission for Health Services. N.C.G.S. § 143B-283(a) (1999) (amended in 2001); N.C.G.S. § 130A-30(a) (2001). A local board of health is limited in its rule-making powers in that the regulation must be "related to the promotion or protection of health." *City of Roanoke Rapids v. Peedin*, 124 N.C. App. 578, 587, 478 S.E.2d 528, 533 (1996).

In holding that the Swine Ordinance and the Health Board Rules were preempted by state law, the Court of Appeals reasoned that the Chatham County Board of Commissioners and the Chatham County Board of Health sought to regulate an area in which the General Assembly had provided a "complete and integrated regulatory scheme" of swine farm regulations. *Craig v. County of Chatham*, 143 N.C. App. 30, 545 S.E.2d 455 (2001); *see also* N.C.G.S. § 160A-174(b)(5). We concur in this assessment.

In determining if the General Assembly intended to provide statewide regulation to the exclusion of local regulation, we must decide if it has shown a clear legislative intent to provide such a "complete and integrated regulatory scheme."

Defendants argue that when the General Assembly intends to preempt the field, it will do so through an express statement of intent.

Furthermore, they argue that without such an expression of intent, this Court would be merely imposing its own judgment for that of the General Assembly in finding that the General Assembly preempted the field. We disagree.

If the General Assembly were required to provide an express statement of intent, N.C.G.S. § 160A-174(b)(5) would be meaningless. The General Assembly can create a regulatory scheme which, though not expressly exclusory, is so complete in covering the field that it is clear any regulation on the county level would be contrary to the statewide regulatory purpose.

In determining the purpose and intent of the General Assembly in adopting the swine regulation statutes, we must primarily look to " 'the spirit of the act[] and what the act seeks to accomplish.' " *State v. Anthony*, 351 N.C. 611, 615, 528 S.E.2d 321, 323 (2000) (quoting *Taylor v. Taylor*, 343 N.C. 50, 56, 468 S.E.2d 33, 37 (1996)). Where legislative intent is not readily apparent from the act, it is appropriate to look at various related statutes *in pari materia* so as to determine and effectuate the legislative intent. *Brown v. Flowe*, 349 N.C. 520, 523-24, 507 S.E.2d 894, 896 (1998).

In *State v. Williams*, this Court relied on a stated purpose similar to the one in the instant case to find that state law preempted local regulation in the Town of Mount Airy. 283 N.C. at 553, 196 S.E.2d at 758. In that case, defendants were arrested for the possession of an open beer, a violation of a Mount Airy city ordinance. *Id.* at 550, 196 S.E.2d at 756-57. Defendants' motion to quash the warrants was allowed because the town ordinance which prohibited the possession of an open beer in public places was in conflict with the general statutory laws of North Carolina, which allowed possession of malt beverages and unfortified wine by eighteen-year-old consumers "without restriction or regulation." *Id.* at 554, 196 S.E.2d at 758-59. When the issue came before this Court, it looked to the "purpose" and "intent" of the pertinent statute:

> "to establish a *uniform system of control* over the sale, purchase . . . of intoxicating liquors . . . to insure, as far as possible, the proper administration of this Chapter under a *uniform system throughout the State*."

*Id.* at 553, 196 S.E.2d at 758 (quoting N.C.G.S. § 18A-1 (1975)) (emphasis added). This Court concluded that the General Assembly had shown by this language an intent to prevent local governments from

enacting ordinances regulating malt beverages. *Id.* at 554, 196 S.E.2d at 759. The ordinance at issue was determined to be inconsistent with state law because (1) it made unlawful something that state law held to be lawful, and (2) the ordinance purported to regulate within a field where the General Assembly had provided a "complete and integrated regulatory scheme." *Id.*

Similarly, in *Greene v. City of Winston-Salem*, 287 N.C. 66, 213 S.E.2d 231 (1975), this Court found upon review of an ordinance enacted by the City of Winston-Salem that there was a legislative intent to preempt. The City of Winston-Salem enacted an ordinance which required sprinkler systems in high-rise buildings. *Id.* at 67, 213 S.E.2d at 232. The City referred to a state law which required sprinkler systems in certain buildings in support of its argument that state law did not give the State Building Code Council sole regulatory authority in the area. *Id.* at 75, 213 S.E.2d at 237. This Court noted that the General Assembly does not have to delegate all or sole authority in the particular regulatory field to one state agency in order to establish that there is a "complete and integrated regulatory scheme." *Id.*

There are two components to the statewide swine farm regulations found in the North Carolina General Statutes, the "Swine Farm Siting Act" and the "Animal Waste Management Systems." In examining each of these, we will look to any statement of "purpose" and "intent" in an effort to determine if the General Assembly has created a "complete and integrated system" for swine farm regulation in the state.

The Swine Farm Siting Act, N.C.G.S. §§ 106-800 to -805 (2001), governs the placement of swine farms and lagoons, and provides in its section designated "Purpose" the following:

> [C]ertain limitations on the siting of swine houses and lagoons for swine farms can assist in the development of pork production, which contributes to the economic development of the State, by lessening the interference with the use and enjoyment of adjoining property.

N.C.G.S. § 106-801. This expression of intent is significant in that it notes pork production is important to the economic stability of the state, yet recognizes that adjoining landowners have a right to the use and enjoyment of their land. This stated intent also shows that the General Assembly was trying to reach a balance between two very

important interests, the economy of North Carolina and the right of a landowner to enjoy his land with minimal interference. If each of North Carolina's one hundred counties is free to create its own particularized regulations for swine farms, the overall balance which the General Assembly has reached within a uniform plan for the entire state will be lost. The result could well be that the rights of adjacent landowners in each individual county would be substantially elevated above the rights of swine farmers to workable, nonexcessive regulations. Swine farms would be forced to comply with both state and county regulations. Furthermore, a swine farmer with a large farm that crossed the boundaries of one or more counties in North Carolina conceivably would have to conform the farm to the regulations established by various counties and those established by the state. Ultimately, such farms could be forced to adapt to differing, even conflicting, regulations. Any such dual regulation would present an excessive burden on swine farmers and the pork production industry as a whole.

The Animal Waste Management Systems component of the statewide regulations, N.C.G.S. §§ 143-215.10A to -215.10M (2001) (§ 143-215.10C altered in 1999; § 143-215.10B altered in 2001), provides in pertinent part: "It is the *intention* of the State to *promote a cooperative and coordinated approach* to animal waste management among the *agencies of the State*." N.C.G.S. § 143-215.10A (emphasis added). This unequivocal statement makes it clear that the purpose for creating these statutes was to regulate animal waste management at the state level. If each county were allowed to enact its own waste management guidelines, there could be no statewide "coordinated approach." Notably also, the agencies designated to implement the Animal Waste Management Systems statutes are exclusively state agencies. N.C.G.S. §§ 143-215.10A to -215.10M (permitting, inspection, and enforcement are vested in the Division of Water Quality, while the Soil and Water Conservation Commission is in charge of designating the technical specialists responsible for inspecting the waste management plans). The expression of intent further provides that one of the goals of the Act is "minimizing the regulatory burden." N.C.G.S. § 143-215.10A. Certainly, the stated goal of limiting or minimizing the burden of the regulatory scheme for waste management systems on swine farms would not be attainable if counties could impose additional burdens on swine farmers to comply with varying regulations.

Thus, from our review of the expressed "purpose" and "intent" of the Swine Farm Siting Act and the Animal Waste Management

statutes, we conclude that these two components of North Carolina's swine farm regulations show an intention to cover the entire field of swine farm regulation in North Carolina.

In addition to the General Assembly's express statements of "purpose" and provisions reflecting "intent" in enacting North Carolina's swine farm regulations, we consider the breadth and scope of the applicable general statutes in determining whether the overall regulatory scheme was designed to be preemptive.

The General Assembly has provided for extensive regulation of swine farms in North Carolina. The Swine Farm Siting Act is applicable to tracts of land raising 250 or more swine[6] and establishes siting requirements for swine houses[7] and lagoons[8] in relation to surrounding areas. N.C.G.S. § 106-803(a). Swine houses and lagoons must be located at least 1,500 feet away from an occupied residence; 2,500 feet away from a school, hospital, or church; and 500 feet away from "any property boundary" or "well supplying water to a public water system." N.C.G.S. § 106-803(a)(1) -(4). The setback requirements where waste has been applied to the land on the farm provide that the land must be at least 75 feet away from perennial streams, rivers, or any property boundary containing an occupied residence. N.C.G.S. § 106-803(a1).

The Swine Farm Siting Act provides for enforcement of its requirements by establishing who is in a position to enforce the Act; what kinds of relief are available; and the possibility of obtaining court costs, attorneys' fees, and expert witnesses' costs. N.C.G.S. § 106-804. The Swine Farm Siting Act's setback distances from any occupied residence, school, hospital, or church can be avoided completely if the farm owner gets the written permission of the adjacent landowner and records it with the county Register of Deeds. N.C.G.S. § 106-803(b). The Swine Farm Siting Act also requires that before locating or constructing a swine farm with 250 or more swine, proper notice must be given to any county where the farm is to be located; adjoining property owners; owners of property across a street, road,

---

6. The Swine Farm Siting Act applies to a "swine farm," and N.C.G.S. § 106-802(5) defines a swine farm as "a tract of land devoted to raising 250 or more animals of the porcine species."

7. "[A] building that shelters porcine animals on a continuous basis." N.C.G.S. § 106-802(6).

8. "[A] confined body of water to hold animal byproducts including bodily waste from animals or a mixture of waste with feed, bedding, litter or other agricultural materials." N.C.G.S. § 106-802(1).

or highway from the farm; and the local health department. N.C.G.S. § 106-805. Proper notice requires service by certified mail and must include, in part: the address of the local Soil and Water Conservation District office, the name and address of the technical specialist that prepared the farm's proposed waste management plan, and the proposed design capacity of the animal waste management system. *Id.*

The Animal Waste Management Systems component regulates swine farms even more extensively than the Swine Farm Siting Act. The Animal Waste Management Systems component creates a "permitting program" which requires swine farm owners to obtain a permit before constructing or operating any waste management system. N.C.G.S. § 143-215.10C(a). An "animal waste management system" is defined as practices "that provide for the collection, treatment, storage, or land application of animal waste." N.C.G.S. § 143-215.10B(3). To obtain the necessary permit, swine farm owners must submit to the EMC their waste management system plan, which has been approved by a technical specialist. N.C.G.S. § 143-215.10C(d). The Animal Waste Management Systems has detailed specifications as to how each farm's animal waste management system shall be designed, constructed and operated so as to prevent pollution. N.C.G.S. § 143-215.10C. It also provides a time limit upon which the EMC must approve or deny the permit after a new permit has been applied for or a renewal permit is sought. N.C.G.S. § 143-215.10C(c). In the event the EMC does not act in the required ninety days, the permit is considered to be approved. *Id.* The Animal Waste Management Systems component provides an extensive list of necessary parts for all animal waste management plans, such as provisions regarding periodic testing of waste products used on the farm as nutrient sources and a checklist of potential odor sources and management practices which are designed to minimize the source of the odor. N.C.G.S. § 143-125.10C(e). Any established swine farm waste management plan must require at least annual testing of the soil at crop sites where the waste has been applied to the land. N.C.G.S. § 143-215.10C(e)(6).

We conclude from the foregoing specifications that North Carolina's swine farm regulations, the Swine Farm Siting Act and the Animal Waste Management Systems statutes are so comprehensive in scope that the General Assembly must have intended that they comprise a "complete and integrated regulatory scheme" on a statewide basis, thus leaving no room for further local regulation.

Turning now to the Health Board Rules enacted by the Chatham County Board of Health, we note that they contain more stringent rules than those established in the EMC regulations. However, N.C.G.S. § 130A-39 specifically grants local boards of health the power to enact rules which are more strict when they are "required to protect the public health." N.C.G.S. § 130A-39(b). In an effort to protect the environment, the EMC has created a system of permitting and inspection which regulates waste management systems on farms, including swine farms of more than 250 swine. *See* 15A NCAC 2H .0217(a)(1)(A) (Sept. 2001).

The pertinent EMC regulation, 15 NCAC 2H .0217 (Rule .0217), outlines the procedure for the proper development of an approved waste management plan. The procedure requires the plan to be certified by a technical specialist certifying that the practices established in the plan meet the applicable minimal standards for a waste management plan. Rule .0217(a)(1)(H)(i)-(ii). Rule .0217(a)(1)(H)(vii) provides the time when approval of the waste management system must be obtained for new farms, before any animals are stocked, and for expanding farms, before any of the additional animals are added. Rule .0217 also contains established buffers, such as the requirement that ponds or lagoons must be located at least one-hundred feet from perennial waters. 15A NCAC 2H .0217(a)(1)(H)(vi).

The EMC permitting regulation also has an established set of guidelines which must be followed when a farm has a change in ownership. 15A NCAC 2H .0217(a)(1)(H)(xii). The new owner must provide written notification to the Division of Environmental Management (DEM) of the Department of Environment, Health, and Natural Resources within sixty days of obtaining ownership. *Id.* The new owner must also assure the DEM that he has read the waste management plan established for the farm, that he understands it, and that he will continue to ensure that it is implemented. *Id.* Rule .0217 also provides for its enforcement. 15A NCAC 2H .0217(e). When there is a willful failure to comply with the EMC permitting regulation, Rule .0217, the Secretary of the Environment, Health, and Natural Resources can assess both fines and penalties. *Id.*

The General Assembly may provide directly for specific statewide regulation, as noted above, and it may delegate regulatory authority to local agencies under sufficient guidelines, as provided in N.C.G.S. § 130A-39(b). However, county commissioners and local boards of health have no authority under the provisions of N.C.G.S. § 130A-39(b) to superimpose additional regulations without specific

reasons clearly applicable to a local health need. The Health Board Rules make the bare assertion that "in some areas, rules more stringent than those of the Environmental Management Commission are required in order to protect the public health." The Health Board, however, does not provide any rationale or basis for making the restrictions in Chatham County more rigorous than those applicable to and followed by the rest of the state.

The Health Board Rules require that "[n]o person shall construct or expand a swine farm in Chatham County without having a swine farm Construction/Expansion permit" for 250 or more swine. However, the EMC permitting regulation already requires that swine farms with waste management facilities supporting 250 or more swine get "permits for construction or operation." 15A NCAC 2H .0217(a). The Health Board Rules provide procedures for handling a change in ownership of the swine farm, while the EMC already addresses this issue, as above set forth. In fact, the EMC rule is very specific and thorough on the issue of a change in ownership. The Health Board Rules establish setbacks which establish minimal distances for new, existing or expanding swine farms in relation to "residences that are either occupied or listed for rent or sale, nursing homes, child care centers, [and] office buildings." The setback distances are imposed according to the size of the swine farm's "animal waste management system," increasing the setback distance with larger systems ranging from 2,500 to 5,500 feet.[9] The setback distances incorporated into the EMC rule require 1,500 feet from an occupied residence and 2,500 feet from any school, hospital, national or state park, or church.[10] The difference between the setback distances established by the Health Board Rules and those set by the EMC is that the Health Board Rules are more stringent. It is apparent that Chatham County enacted its Health Board Rules in an effort to place more stringent regulations on swine farmers and has done so without any showing that such regulations are "required to protect the public health," as specified by N.C.G.S. § 130A-39(b). This we hold is impermissible.

---

9. These buffer distances are not the applicable standard when the building or home has "come to the nuisance," wherein the swine farm existed before the building or home.

10. The EMC incorporates provisions of the Field Office Technical Guide. The Field Office Technical Guide refers to N.C.G.S. §§ 106-801 to -805, a portion of the Swine Farm Siting Act, as establishing the proper standard for setback distances. See Natural Resources Service Conservation Practice Standard, Code 425, at 3 (Sept. 1996).

When we look at the Swine Farm Siting Act, the Animal Waste Management Systems statutes, and the EMC's regulation together, as parts of an overall scheme, we conclude that the Swine Ordinance and the Health Board Rules are incompatible with state law in that they purport to regulate a field in which the State has provided a "complete and integrated regulatory scheme" to the exclusion of local regulation. We therefore affirm the Court of Appeals in this regard.

[2] We next address the issue of the ordinance to amend the Zoning Ordinance, which is before us upon plaintiffs' petition for discretionary review as to an additional issue. Plaintiffs contend the Court of Appeals erred in upholding the Zoning Ordinance. We agree.

"Counties have no inherent authority to enact zoning ordinances." *Jackson v. Guilford Cty. Bd. of Adjust.*, 275 N.C. 155, 162, 166 S.E.2d 78, 83 (1969). N.C.G.S. § 153A-340 is the statutory grant of power which provides counties with the authority to zone. There is, however, a specific limitation on this grant of power as it relates to swine farms:

> A county may adopt zoning regulations governing swine farms served by animal waste management systems having a design capacity of 600,000 pounds steady state live weight (SSLW) or greater provided that the zoning regulations may not have the effect of excluding swine farms served by an animal waste management system having a design capacity of 600,000 pounds SSLW or greater from the entire zoning jurisdiction.

N.C.G.S. § 153A-340(b)(3) (2001).

The Zoning Ordinance, as amended, enacted by Chatham County requires all swine farms served by an animal waste management system having a design capacity of 600,000 pounds SSLW or greater, regardless of the actual number of swine, to be located in either a "Light" or "Heavy Industrial" district. The Zoning Ordinance further compels applicants to obtain a Construction/Expansion permit "as required by the [Swine Ordinance]."

Plaintiffs contend that in light of the Court of Appeals' determination that the Swine Ordinance is invalid, the Zoning Ordinance's express incorporation of the Swine Ordinance causes the Zoning Ordinance to fail as well. Specifically, plaintiffs argue that state preemption of the Swine Ordinance, as it is incorporated in the Zoning Ordinance, invalidates the Zoning Ordinance.

The Zoning Ordinance is not *per se* invalid. However, in this case, as written, the Zoning Ordinance cannot stand.

The sole restriction on zoning swine farms is that they "may not have the effect of excluding swine farms served by an animal waste management system having a design capacity of 600,000 pounds SSLW or greater from the entire zoning jurisdiction." N.C.G.S. § 153A-340(b)(3). Chatham County's Zoning Ordinance does not exclude all farms with an animal waste management system of 600,000 SSLW or greater, but merely restricts these farms to "Light" or "Heavy Industrial" districts within the county. The Zoning Ordinance complies with the restrictions established in section 153A-340(b)(3).

However, the requirement in the Zoning Ordinance that the applicant must have a Construction/Expansion permit obtained through compliance with the Swine Ordinance proves to be fatal. The Zoning Ordinance requires compliance with only a portion of the Swine Ordinance; however, that specific portion of the Swine Ordinance requires compliance with *all* other sections of the Swine Ordinance, to the extent the other sections are applicable to swine farms.

As we noted above, the Swine Ordinance cannot stand because it seeks to impose regulations on swine farmers where the State has shown an intent to cover the field of swine farm regulation. The Zoning Ordinance's attempt to incorporate the Swine Ordinance prevents us from sustaining its validity. Accordingly, we conclude that the Zoning Ordinance's incorporation of the Swine Ordinance invalidates the Zoning Ordinance.

[3] As to defendants' third issue, whether the Board of Health may regulate swine farms under N.C.G.S. § 130A-39 upon considerations other than health, we hold it may not for the reasons hereinabove set forth.

Upon the foregoing, the decision of the Court of Appeals is affirmed in part and reversed in part.

AFFIRMED IN PART; REVERSED IN PART.