GRANVILLE FARMS, INC., Plaintiff v. COUNTY OF GRANVILLE, Defendant

No. COA04-234

(Filed 3 May 2005)

**Environmental Law— local regulation of biosolids applications—preemption by state law**

Granville County's biosolid application ordinance was preempted by state statutes and regulations and summary judgment was granted correctly for plaintiff biosolids application company. The state regulation is comprehensive and leaves no room for further local regulation. N.C.G.S. § 143-211(c).

Appeal by defendant from judgment entered 17 December 2003 by Judge Kenneth C. Titus in Granville County Superior Court. Heard in the Court of Appeals 13 October 2004.

*Parker, Poe, Adams & Bernstein, LLP, by John J. Butler, for plaintiff-appellee.*

*Hopper & Hicks, LLP, by William L. Hopper and James C. Wrenn, Jr., for defendant-appellant.*

*North Carolina Association of County Commissioners, by General Counsel James B. Blackburn, III, amicus curiae.*

STEELMAN, Judge.

Defendant, Granville County (County), appeals the trial court's entry of summary judgment in favor of plaintiff, Granville Farms, Inc. For the reasons discussed herein, we affirm the trial court.

Plaintiff, Granville Farms, is a farming and biosolids application company located in Granville County, North Carolina. It applies biosolids to land. Biosolids, also known as residuals, consist of the sludge generated from the treatment of domestic sewage in waste-water treatment plants. The predominant use of biosolids is land application to farms for fertilizer. At the time plaintiff instituted this lawsuit, it was applying biosolids to lands in Granville County including, but not limited to its own lands, pursuant to a permit issued by the North Carolina Department of Environment and Health (DENR). On 6 October 2003, the County adopted the Granville County Sludge and Septage Ordinance (ordinance). This ordinance imposed an additional layer of regulation, which required those in the business of land application of residuals to: (1) obtain a permit from the county in addition to the state permit; (2) pay substantial permitting fees; (3) record a warning in the chain of title of the property that biosolids had been applied to the land; (4) keep more extensive records than required by state regulations; and (5) provide additional and more detailed notice of the application of biosolids to local authorities. On 7 November 2003, plaintiff filed this action seeking to have the ordinance declared unlawful. Although the complaint contained eight separate claims for relief, plaintiff moved for summary judgment only as to its first claim, which alleged the ordinance was preempted by the existing scheme of comprehensive regulation by the State of North Carolina. The County also filed a motion for summary judgment relating only to plaintiff's first claim. The trial court granted plaintiff's motion for summary judgment, declaring the ordinance invalid and enjoining the County from enforcing it against plaintiff. Granville County appeals.

Summary judgment is proper when the pleadings, considered together with depositions, answers to interrogatories, admissions on file, and supporting affidavits show there to be no genuine issue regarding any material fact and that a party is entitled to judgment as a matter of law. N.C. Gen. Stat. § 1A-1, Rule 56(c) (2004). The trial court may grant a party's motion for summary judgment in cases requiring the interpretation of ordinances and statutes. *See Craig v. County of Chatham*, 356 N.C. 40, 565 S.E.2d 172 (2002). As with all matters involving the granting or denial of summary judgment, an appellate court reviews the trial court's decision *de novo*, with the evidence to be viewed in the light most favorable to the non-movant. *Stafford v. County of Bladen*, 163 N.C. App. 149, 151, 592 S.E.2d 711, 713 (2004).

The sole issue before this Court is whether the ordinance was preempted because it purports to regulate a field for which a state or federal statute clearly shows a legislative intent to provide a complete and integrated regulatory scheme to the exclusion of local regulation. *Accord Craig*, 356 N.C. at 45, 565 S.E.2d at 176.

We first review the state rules, regulations, and permit requirements pertaining to the land application of biosolids. Before a person or entity can apply sludge resulting from the operation of a treatment works to land, it must obtain a permit issued by the state. N.C. Gen. Stat. § 143-215.1(a)(9) (2004). The state agency responsible for issuing the permit and promulgating the rules for such application is the North Carolina Department of Environment and Natural Resources (DENR). The General Assembly created DENR to "administer a program of water and air pollution control and water resource management." N.C. Gen. Stat. § 143-211(c) (2004). By this statute, the General Assembly vested DENR with the authority "to administer a complete program of water and air conservation, pollution abatement and control and to achieve a coordinated effort of pollution abatement and control with other jurisdictions." *Id.* The legislature also gave the North Carolina Environmental Management Commission (EMC) the authority to adopt rules necessary to fulfill the purposes of Article 21, which governs water and air resources. *See* N.C. Gen. Stat. § 143-215.3(a)(1) (2004). The state regulations involved in this case were not imposed directly by statute, but were promulgated by two state agencies, DENR and EMC. However, it is not necessary that state regulations preempting a county ordinance be imposed directly by the legislature in the form of a statute as long as the government agency imposing the regulations is authorized to

do so. *See Greene v. City of Winston—Salem,* 287 N.C. 66, 75, 213 S.E.2d 231, 237 (1975). Nor is it required that this authority be vested solely in one agency. *Id.*

Counties enjoy the power and authority to enact ordinances and by-laws relating to the "health, safety, or welfare of its citizens," N.C. Gen. Stat. § 153A-121 (2004). This power is limited where the ordinance is inconsistent with state or federal law. N.C. Gen. Stat. § 160A-174(b) (2004).[1] Although this statute is found in the statutes dealing with cities and towns, its provisions are also applicable to counties. *Craig,* 356 N.C. at 45, 565 S.E.2d at 176. An ordinance is deemed inconsistent where it "purports to regulate a field for which a State or federal statute clearly shows a legislative intent to provide a complete and integrated regulatory scheme to the exclusion of local regulation[.]" N.C. Gen. Stat. § 160A-174(b)(5). If local ordinances are deemed inconsistent or conflict with state or federal laws, the ordinance will be deemed invalid. *Craig,* 356 N.C. at 44, 565 S.E.2d at 175. Ordinances and the laws of the state need to be in accord to avoid confusion among the state's citizens and to avoid dual regulation. *Id.*

In determining whether the General Assembly intended to provide statewide regulation of the land application of biosolids to the exclusion of local regulation, this Court must ascertain if the General Assembly "has shown a clear legislative intent to provide a 'complete and integrated regulatory scheme.' " *Id.* at 45, 565 S.E.2d at 176 (referring to N.C. Gen. Stat. § 160A-174(b)(5)).

Plaintiff's permit states that its activities are regulated pursuant to "the provisions of Article 21 of Chapter 143" of the General Statutes. The statement of purpose in Article 21 reads as follows:

It is the purpose of this Article to create an agency which shall administer a program of water and air pollution control and water resource management. It is the intent of the General Assembly, . . . to confer such authority . . . as shall be necessary to administer a complete program of water and air conservation, pollution abatement and control and to achieve a coordinated effort of pollution abatement and control with other jurisdictions.

---

1. Although the trial court's order held the County's ordinance invalid because it was "contrary to state law," there is no evidence in the record or the facts to suggest the court based its decision on any of the provisions listed in N.C. Gen. Stat. § 160A-174(b) other than subsection (b)(5). Both parties' briefs focus their arguments solely on the application of this subsection to the ordinance.

N.C. Gen. Stat. § 143-211(c). This statement of intent to provide a "complete program" strongly indicates the legislature intended to create a "complete and comprehensive statute." *See e.g.*, *Craig*, 356 N.C. at 48-9, 565 S.E.2d at 178 (finding statement that legislature intended to "promote a cooperative and coordinated approach to animal waste management among the agencies of the State" showed "an intention to cover the entire field of swine farm regulation in North Carolina"); *State v. Williams*, 283 N.C. 550, 553-54, 196 S.E.2d 756, 758-59 (1973) (finding the statement of purpose "to establish a uniform system of control" exhibited the legislature's intent to pre-empt local regulation).

If each county were free to create its own particularized regulations regarding land application of biosolids, the coordinated effort which the General Assembly referred to in the statute would fail. There can be no coordinated program if there exists a patchwork of local regulations governing the application of biosolids. The County's ordinance imposes a number of additional requirements upon an entity seeking to apply biosolids to farm lands. The state statute caps the annual fee for a permit to dispose of biosolids on 300 or more acres of land at $1,090.00. N.C. Gen. Stat. § 143-215.3D(a)(6) (2004). The ordinance requires an additional permit fee of $10.00 per acre. Plaintiff applies biosolids to 2774 acres in Granville County, which includes 515 acres of its own land. In order for plaintiff to obtain a county permit it would have to pay a total of $27,740.00 each year. In addition, the state regulations require the permit holder to give general notice to the local governmental agency (*i.e.* county manager, city manager, etc.) at least twenty-four hours *prior to* the application to any *new* land application site, and such notice need not be in writing. However, the County's ordinance requires the permittee to give written notice within four hours *after any* application of biosolids to *any* land in Granville County. The County's notice requirement also requires that the permit holder's written notice include the following information, which the state does not:

(a) The type of sludge or septage applied.

(b) The source of the sludge or septage land applied, including the address of the generator and the name and telephone number of the contact person for the generator.

(c) The fields or other areas to which the sludge or septage were applied.

(d) The volume of sludge or septage applied.

*Craig* points out that the problem with conflicting regulations is that it is possible an entity engaging in business in more than one county in North Carolina could conceivably have to conform to the regulations established by the state as well as those established by various counties. *Craig,* 356 N.C. at 48, 565 S.E.2d at 178 ("Ultimately, such [businesses] could be forced to adapt to differing, even conflicting, regulations. Any such dual regulation would present an excessive burden on [such businesses]") *Id.* Further, the effect of the County's substantial fees and additional regulations will be to drive this type of operation from Granville County into adjoining counties. This was clearly not contemplated by the General Assembly's comprehensive regulation of the land application of residuals.

The County next contends the reference in N.C. Gen. Stat. § 143-211(c) to a "complete program" at the beginning of the sentence is qualified by other language referencing the achievement of "a coordinated effort of pollution abatement and control with *other jurisdictions.*" (emphasis added). The County asserts "other jurisdictions" means other counties and municipalities within the state. We disagree. Neither of these phrases can be read in isolation to garner the intent of the legislature, but must be read in their totality. It is more logical that achieving "a coordinated effort" with "other jurisdictions" refers to other state or federal agencies because these agencies are charged with the regulation of pollution. Even assuming *arguendo* that "other jurisdictions" refers to counties and municipalities, when read in context with the intent to create a "complete program" and a "coordinated effort," it strongly indicates the General Assembly intended DENR to be the agency in charge of efforts to safeguard the environment.

Further, a careful reading of Article 21 reveals that the General Assembly provided for two specific areas where local government would be allowed to regulate in the environmental area. Significantly, both of the local government exceptions require certification and approval of the local regulation by the EMC. *See* N.C. Gen. Stat. § 143-215.3(a)(14) (2004) (allowing local governments to administer and enforce wastewater pretreatment programs only if certified by the EMC); N.C. Gen. Stat. § 143-215.112(a) (2004) (allowing local air pollution programs only if reviewed and certified by the EMC). To aid in statutory construction, the maxim *expressio unius est exclusio alterius* applies. *Morrison v. Sears, Roebuck & Co.,* 319 N.C. 298, 303, 354 S.E.2d 495, 498 (1987). This means that the express mention of specific exceptions in a statute implies the exclusion of all others.

*Id.* The fact that the General Assembly provided in Article 21 for certain specific local government pollution control programs, but only if those specific programs were certified by the EMC, demonstrates the "complete program" of pollution control the legislature called for in Article 21 did not intend for local governments to enact their own uncertified ordinances for regulation of land application activities.

We conclude N.C. Gen. Stat. § 143-211(c) evidences an intent to create a complete and integrated regulatory scheme to the exclusion of local regulation.

In addition to the legislature's express statement of purpose and the provisions reflecting its intent to create an agency to expressly oversee water and resource conversation and the abatement of pollution, we also review "the breadth and scope of the applicable general statutes in determining whether the overall regulatory scheme was designed to be preemptive." *Craig*, 356 N.C. at 49, 565 S.E.2d at 178.

EMC established rules listing the requirements necessary to secure a permit for the land application of residuals. 15A N.C.A.C. 2H.0205(d)(6) (2005). Those requirements include submission of a soil scientist's recommendations for application rates, an agronomist's evaluation concerning cover crops and their ability to accept proposed application rates, information on nearby wells, and a soil evaluation by a soil scientist. DENR is then authorized to "issue a permit containing such conditions as are necessary to effectuate the purposes of Article 21, Chapter 143, N.C. General Statutes." 15A N.C.A.C. 2H.0209(b)(1).

The state permit issued to plaintiff covers all aspects of the land application of residuals. It contains extensive rules and requirements which the permittee must comply with in order to retain a valid permit. Both the source of the biosolids and the land application site are subject to preapproval by DENR in the permit, and no unapproved sources or sites may be used. The permit contains detailed rules on how land application is to be performed, including requirements for a certified operator and application at agronomic rates. It contains detailed requirements regarding the notice and reporting that must be made to state and local governments. It also requires a permittee to maintain extensive records of land application events and to test both the source material and soil on which it has been applied. The permit provides for buffer zones and prohibits nuisance conditions. It further contains extensive and detailed requirements on how the land

may be used after the residuals have been applied. For example, virtually all farming activities are prohibited for thirty days following application, and then activities are gradually allowed depending on conditions until thirty-eight months have passed, at which time all restrictions on use of the land are lifted. The permit authorizes inspection of the property where residuals have been applied and requires the permittee to keep a detailed log regarding its own monitoring activities. To ensure compliance with the requirements of the permit, the permittee is further required to have landowner agreements with each receiving site landowner, prohibiting the landowner from using land on which residuals have been applied in a manner inconsistent with the permit.

We conclude from the foregoing that the statute, coupled with the permit requirements set forth in the applicable regulations, are so comprehensive in scope that they were intended to comprise a "complete and integrated regulatory scheme" on a statewide basis, thus leaving no room for further local regulation.

The County further contends there is language in the permit which specifically contemplates the enactment of local ordinances. The portions of the permit cited by the County states:

The issuance of this permit does not preclude the Permittee from complying with any and all statutes, rules, regulations, or ordinances that may be imposed by other government agencies (i.e., local, state, and federal) which have jurisdiction, including, but not limited to, applicable river buffer rules in 15A N.C.A.C. 2B .0200, soil erosion and sedimentation control requirements in 15A N.C.A.C. Chapter 4 and under the Division's General Permit NCG010000, and any requirements pertaining to wetlands under 15A N.C.A.C. 2B .0200 and 15A N.C.A.C. .0500.

The fact the permit states that it "does not preclude" compliance with the rules of local governments "which have jurisdiction" does not necessarily provide jurisdiction to a local government to enact regulations that duplicate and conflict with a comprehensive state regulatory scheme. The permit lists several specific types of regulations applying to river buffers, sedimentation control, and wetlands. There is no reference to the regulation of land application activities. While the list set forth in the permit is not exclusive, the general statement that other laws may apply must be interpreted in accordance with the rule of statutory construction known as *ejusdem generis*. That is, the " 'meaning of the general words will ordinarily be

presumed to be, and construed as . . . including only things of the same kind, character and nature as those specifically enumerated.' " *Knight v. Town of Knightdale*, 164 N.C. App. 766, 769, 596 S.E.2d 881, 884 (2004) (quoting *State v. Lee*, 277 N.C. 242, 244, 176 S.E.2d 772, 774 (1970)). By listing the type of other governmental rules that may apply, it demonstrates that DENR envisioned compliance with rules issued pursuant to programs that do not specifically regulate land application, but generally apply to all land disturbing activities. The type of laws mentioned in the permit which may govern a permittee's conduct are of a type of regulation separate and distinct from that provided by Article 21 and the permits issued thereunder. The ordinance at issue is not that type of regulation. It only applies to the disposal of residuals, which is the type of activity already regulated by Article 21 and the permit issued to Granville Farms. Therefore, under the doctrine of *ejusdem generis*, the ordinance cannot be included in the permit's general reference to other laws since it is not the type of regulation listed after the general reference.

The County also points to the provision in the permit regarding landowner agreements as contemplating local involvement, because it authorizes local officials, as well as state officials to inspect the land application site prior to, during, and after any biosolids have been applied and to take soil and water samples. The County contends its ordinance does not regulate the land application of biosolids, but only serves to monitor the application of biosolids pursuant to a state permit. This assertion is contradicted by the County's own regulatory provisions which impose substantial fees for obtaining a permit, contain provisions for filings with the register of deeds, and contain extensive notice requirements. Further, the County's ordinance is duplicative, in that the provisions of the permit already provide that the local government may monitor land application of biosolids. It is therefore unnecessary for the County to enact a separate ordinance.

Because the state regulation of the land application of residuals is comprehensive, constituting a complete and integrated regulatory scheme, the County does not have authority to enact ordinances that also purport to specifically regulate that conduct. This assignment of error is without merit.

AFFIRMED.

Judges CALABRIA and GEER concur.