MARVIN ANDERSON, ET AL., PLAINTIFFS v. HOUSING AUTHORITY OF THE CITY OF RALEIGH, DEFENDANT

No. COA04-152

(Filed 15 March 2005)

**Negligence— carbon monoxide poisoning—causation—mere speculation or conjecture**

The trial court did not err in a negligence action arising out of the release of carbon monoxide from gas boilers installed at a public housing development where plaintiffs were residents by granting summary judgment in favor of defendant Housing Authority, because: (1) plaintiffs' counsel acknowledges that the evidence was insufficient to support a prima facie case of negligence for 10 of the 21 plaintiffs; (2) plaintiffs did not present any argument in support of their assignments of error regarding 2 other plaintiffs; and (3) in regard to the remaining 9 plaintiffs, none pointed to affirmative evidence to forecast a showing of causation beyond mere speculation or conjecture.

Appeal by plaintiffs from judgment entered 6 August 2003 by Judge Donald W. Stephens in Wake County Superior Court. Heard in the Court of Appeals 13 October 2004.

*Thigpen, Blue, Stephens & Fellers, by T. Byron Smith, and Gary, Williams, Parenti, Finney, Lewis, McManus, Watson, & Sperando, by Michael Lewis, for plaintiffs-appellants.*

*Cranfill, Sumner & Hartzog, L.L.P., by Dan M. Hartzog and Donna R. Rascoe, for defendant-appellee.*

ANDERSON v. HOUSING AUTH. OF CITY OF RALEIGH

[169 N.C. App. 167 (2005)]

ELMORE, Judge.

I.

Plaintiffs are twenty-one former residents of the Walnut Terrace public housing development (Walnut Terrace) in Raleigh. The Housing Authority of Raleigh (defendant), pursuant to its authority as a landlord of Walnut Terrace, installed gas boilers on the property and began operating them in January 1987. On 2 October 1995 plaintiffs, as part of a larger group of former residents, filed a negligence action against defendant, alleging that the release of carbon monoxide from these gas boilers caused plaintiffs' injuries. Plaintiffs allege that the problems with the gas-fired heating system occurred between January 1987 and October 1992. On 8 April 2003 defendant filed a motion for summary judgment seeking to dismiss the claims of 28 of the plaintiffs. The trial court entered its order on 6 August 2003 allowing defendant's motion with respect to 23 of the 28 plaintiffs. The court found that there were no genuine issues of material fact; that defendant was entitled to judgment as a matter of law; and that the plaintiffs failed to show any causal connection between their exposure to carbon monoxide and the injuries alleged. Of the 23 plaintiffs whose claims were dismissed by the court's order, 21 filed notice of appeal to this Court.

Plaintiffs contend that the trial court erred in granting summary judgment on their negligence claims. However, plaintiffs' counsel acknowledges that the evidence is insufficient to support a *prima facie* case of negligence for 10 of the 21 plaintiffs.[1] In addition, plaintiffs do not present any argument in support of their assignments of error regarding two other plaintiffs, Edna Holder and Barry Ruffin. Accordingly, we deem plaintiffs' assignments of error with respect to these 12 plaintiffs abandoned. *See* N.C.R. App. P. 28(b)(6) (2004) ("Assignments of error not set out in the appellant's brief, or in support of which no reason or argument is stated or authority cited, will be taken as abandoned."). We briefly recite the causation evidence from the record in support of the negligence claims of the remaining 9 plaintiffs to this appeal:

Dr. Cyril Allen, a physician specializing in internal medicine, examined plaintiffs in July and August 1997. The reports written by Dr. Allen following each examination were included as an exhibit

1. Plaintiffs' counsel identified the following plaintiffs, noting that these plaintiffs or their parents denied any injuries: Seneca Jones, Shanta Jones, Alisa Rhodes, Shanita Rhodes, Louis Porter, Cecilia Anderson, Logan Anderson, Zola Anderson, Tyler Johnson, and De Thabon Nettles.

in the deposition testimony submitted to the trial court at summary judgment. However, Dr. Allen did not provide a medical opinion on the matter of causation.

### Yolanda Hinton

Ms. Hinton lived in Walnut Terrace from 1987 through 1992. She testified that she went to see a physician at Wake Medical Center in 1993, Dr. Haywood, and that he diagnosed her with migraine headaches. Ms. Hinton stopped seeing Dr. Haywood in 1995. The only medical documentation provided for Ms. Hinton is a report by Dr. Cyril Allen of a physical examination conducted on 3 August 1997. Dr. Allen stated in the report that Ms. Hinton had no history of recurrent headaches or blurring of vision.

### Angela Vessel

Ms. Vessel testified that she lived in Walnut Terrace from June 1992 through December 1993. She stated that she suffered from headaches and consulted a physician at Wake Medical Center about this problem in December 1992. She testified that she was examined for lead and carbon monoxide exposure and thought that the results came up negative. Ms. Vessel's daughter began having nosebleeds in December 1992, and she was examined during the same visit. Ms. Vessel testified that the results for her daughter's lead test came out positive but that she could not recall the results of the carbon monoxide test. Dr. Allen conducted a physical examination of Ms. Vessel on 16 August 1997 and prepared a report noting his impression that the exam was normal.

### Eddie Turner

Mr. Turner, who was 53 years old at the time of his deposition in June 2000, testified that he lived in the Walnut Terrace housing units for approximately 17 years. When asked about his medical problems, he stated that he was diagnosed with sleep apnea and that he experiences sharp pains running through his heart, for which he takes aspirin. Also, he testified that he sometimes feels nauseous in the mornings and thinks that his nausea could have been caused by carbon monoxide exposure.

### Timothy Nettles

Mr. Nettles testified that he was under 10 years of age when he lived at Walnut Terrace. He described his ailments as vomiting, migraine-like headaches, dizziness, and problems with his heart beat-

ing funny. Mr. Nettles testified that he took pain reliever to treat his migraines, but he did not take any medications for the other symptoms. Dr. Allen's report noted that the overall physical examination of Mr. Nettles was normal.

### Latonya Hartsfield

Ms. Hartsfield resided at Walnut Terrace from about 1989, when she was 8 years old, through 2000. She testified that she had migraines and that her mother gave her Tylenol to help her sleep. She also testified that some mornings she would wake up with a nosebleed because the air was so humid in her room.

### Leroy Evans

Mr. Evans testified that he has never resided at Walnut Terrace, but that his parents lived there for about 35 years. He stated that he visited his parents on weekends and that in total he spent about two months per year at Walnut Terrace. He has suffered from nausea symptoms since 1990. Mr. Evans also experienced headaches since before 1990 and shortness of breath beginning around 1996. Mr. Evans testified that he was diagnosed with hypertension in 1997, but that his doctor did not indicate how long the hypertension had existed. He stated that he has never informed a physician about potential exposure to carbon monoxide as the cause of his symptoms. Dr. Allen noted that the overall examination of Mr. Evans was normal.

### Wanda Jones

Ms. Jones testified that she lived in Walnut Terrace from 1990 through 1995. She experienced a groggy-like feeling on and off for several months after moving to Walnut Terrace. Ms. Jones stated that she took Tylenol for headaches, and that she thought the grogginess and headaches were caused by carbon monoxide exposure. However, she testified that she has never been tested for carbon monoxide exposure.

### Joshua Rhodes

Joshua was born in 1986 and recalls living at Walnut Terrace when he was eight years old. He testified that he woke up one night with a nosebleed while living there. Dr. Allen examined Joshua on 19 July 1997 and noted that a limited neurological exam was within normal limits and that there were no significant abnormalities detected. Defendant's expert, Dr. William Meggs, reviewed the report by Dr.

Allen documenting Joshua's examination and concluded that nothing in the report suggested anything but a healthy child.

### Manda Nettles

Ms. Nettles testified that she suffered from irregular heartbeat, blurred vision, and nausea. She stated that she thinks these symptoms were caused by exposure to carbon monoxide during the time when she lived at Walnut Terrace, between the ages of eight and eleven. Dr. Allen conducted a physical examination of Ms. Nettles on 27 July 1997 and noted in his report that she did not have a history of disease of the head, eyes, ears, or throat.

## II.

Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that any party is entitled to judgment as a matter of law." N.C. Gen. Stat. § 1A-1, Rule 56(c) (2003). The party moving for summary judgment has the burden of proving that there is no triable issue of material fact. *Collingwood v. G.E. Real Estate Equities*, 324 N.C. 63, 66, 376 S.E.2d 425, 427 (1989). This burden may be met "by proving that an essential element of the opposing party's claim is nonexistent, or by showing through discovery that the opposing party cannot produce evidence to support an essential element of his claim . . . ." *Id.* If the defendant meets this burden, then the plaintiff must "produce a forecast of evidence demonstrating that the plaintiff will be able to make out at least a prima facie case at trial." *Id.* In order to survive a motion for summary judgment, a plaintiff must offer evidence of each essential element of negligence beyond mere speculation or conjecture. *Roumillat v. Simplistic Enterprises, Inc.*, 331 N.C. 57, 68, 414 S.E.2d 339, 345 (1992).

Here, the deposition testimony of Dr. William Meggs established that the symptoms of carbon monoxide exposure include persistent headaches, nausea, and neuropsychiatric disabilities. Plaintiffs assert that the symptoms described by each of the plaintiffs in their depositions are consistent with the symptoms described by this expert witness. For example, plaintiffs point out that the deposition testimony of Wanda Jones tends to establish that prior to moving to Walnut Terrace, she did not experience any symptoms consistent with carbon monoxide poisoning and that the symptoms of headaches and groggy-like feelings began after she moved there. Thus, plaintiffs

argue, it is reasonable to infer that her condition was caused by carbon monoxide exposure. However, Ms. Jones presented no affirmative evidence, in the form of physician or laboratory reports or otherwise, connecting the injuries complained of to carbon monoxide exposure. The report by Dr. Allen does not suggest anything other than a normal examination. Likewise, plaintiffs Yolanda Hinton, Angela Vessel, Eddie Turner, Timothy Nettles, Latonya Hartsfied, Leroy Evans, Joshua Rhodes, and Manda Nettles point to no affirmative evidence to forecast a showing of causation sufficient to defeat a motion for summary judgment.

In contrast to plaintiffs' assertions that their forecast of causation evidence was sufficient, Dr. Laura Jozewicz testified that after reviewing plaintiffs' medical documents provided to her by Dr. Cyril Allen, she lacked the information about the time frame of exposure to carbon monoxide and any test results sufficient to form an opinion to a reasonable degree of medical certainty about causation. Dr. Allen testified that he referred plaintiffs to Dr. Jozewicz, a neurologist, and that he did not have any additional information which was not passed on with the referral. In each plaintiff's case, the testimony by Dr. Jozewicz and the report of physical examination by Dr. Allen refute plaintiffs' allegations.

In sum, plaintiffs have not forecast evidence of causation beyond conjecture. In particular, plaintiffs do not set forth any specific facts to controvert the testimony by Dr. Jozewicz that there is insufficient information from which to form an opinion as to whether the release of carbon monoxide caused plaintiffs' symptoms. No expert for plaintiffs testified that plaintiffs' symptoms could or might have been caused by the gas boilers at Walnut Terrace. Where a layperson can do no more than speculate as to the cause of a physical condition, the medical opinion of an expert is required to show causation. *Miller v. Lucas*, 267 N.C. 1, 14-15, 147 S.E.2d 537, 547 (1966). Therefore, even when viewed in the light most favorable to plaintiffs, the evidence fails to establish an essential element of plaintiffs' negligence claims beyond mere speculation or conjecture. *See Roumillat*, 331 N.C. at 68, 414 S.E.2d at 345; *Johnson v. Scott*, 137 N.C. App. 534, 537, 528 S.E.2d 402, 404 (2000) (plaintiff must come forward with specific facts, not mere speculation, that controvert the facts set forth in moving party's evidentiary forecast).

After reviewing the record and briefs, we hold that there is no genuine issue of material fact as to causation, and that the trial court correctly granted summary judgment in favor of defendant.

GUTIERREZ v. GDX AUTO.

[169 N.C. App. 173 (2005)]

Affirmed.

Judges McGEE and McCULLOUGH concur.