DAVID STANDLEY, Plaintiff v. TOWN OF WOODFIN, an incorporated municipality in the State of NC; and BRETT HOLLOMAN, Chief of Police, in his Official Capacity, Defendants

No. COA06-1449

(Filed 2 October 2007)

**Constitutional Law; Sexual Offenses— registered sex offender—access to public park prohibited**

      The trial court did not err by granting summary judgment for the defendant town on a challenge to an ordinance which declared that entry into the public parks of the town by registered sex offenders was an offense against the regulations of the town. The ordinance is restrictive only as to defendant's public parks and does not violate the right to intrastate travel; it is not punitive in intent nor effect and does not violate the ex post facto clause; and it is rationally related to its intended purpose of protecting the health and safety of the citizens of the town.

      Judge GEER dissenting.

      Appeal by Plaintiff from judgment entered 7 August 2006 by Judge James L. Baker in Buncombe County Superior Court. Heard in the Court of Appeals 23 May 2007.

      *Cloninger, Elmore, Hensley & Searson, PLLC, by Bruce A. Elmore, Jr., for plaintiff.*

      *Ferikes & Bleynat, by Joseph A. Ferikes, for defendant.*

      ELMORE, Judge.

      David Standley (plaintiff) appeals a judgment of the Buncombe County Superior Court entered 7 August 2006. For the reasons stated herein, we affirm the decision.

      Plaintiff resides with his mother in the Town of Woodfin (Woodfin) in Buncombe County. In 1987, while living in Florida, plaintiff was convicted of attempted sexual battery and aggravated assault against a woman, making him subject to the North Carolina Sex Offender & Public Protection Registry (the Registry). The Registry requires individuals who have committed an offense against a minor or a sexually violent offense to register as sex offenders. N.C. Gen. Stat. §§ 14-208.6(4), 14-208.7(a) (2005). Plaintiff served three and a

half years of his nine-and-a-half-year sentence; the remaining six years of his sentence were suspended and he was placed on supervised probation. In 1995, plaintiff was convicted of solicitation of prostitution. As a result, his probation was revoked. In 1999, plaintiff was unconditionally released. In 2004, he moved to Buncombe County, where he registered with the Registry at the sheriff's office as required by N.C. Gen. Stat. § 14-208.7.

Plaintiff suffered a stroke in 1998, as a result of which he never travels without his mother. Plaintiff frequented the Woodfin Riverside Park, always with his mother and sometimes with other family members as well.

Plaintiff challenged an ordinance, enacted on 19 April 2005, that prohibits registered sex offenders from knowingly entering any public park owned and operated by defendant-appellee Woodfin (the ordinance). The ordinance states, in relevant part,

> It shall constitute a general offense against the regulations of the Town of Woodfin for any person or persons registered as a sex offender with the state of North Carolina and or any other state or federal agency to knowingly enter into or on any public park owned, operated, or maintained by the Town of Woodfin.

Woodfin, N.C., Ordinances § 130.03 (19 April 2005). Prior to the enactment of the ordinance, two incidents of sexual offenses occurred in or near two of the three public parks in Woodfin. Plaintiff and Woodfin[1] filed motions for judgment on the pleadings and summary judgment. The Buncombe County Superior Court granted Woodfin's motion for summary judgment. Plaintiff appeals.

We review the trial court's decision *de novo*. *Magnolia Mfg. of N.C. v. Erie Ins. Exch. Ins.*, 179 N.C. App. 267, 277, 633 S.E.2d 841, 847 (2006) (citing *Howerton v. Arai Helmet, Ltd.*, 358 N.C. 440, 470, 597 S.E.2d 674, 693 (2004)). "Alleged errors of law are subject to *de novo* review on appeal." *Falk Integrated Tech., Inc. v. Stack*, 132 N.C. App. 807, 809, 513 S.E.2d 572, 574 (1999) (citation omitted). Rulings on motions for judgment on the pleadings under N.C. Gen. Stat. § 1A-1, Rule 12(c) are also reviewed *de novo*. *Toomer v. Branch Banking & Tr. Co.*, 171 N.C. App. 58, 66, 614 S.E.2d 328, 335 (2005) (citations omitted).

---

1. Brett Hollomon, Chief of Police, is also a party to this case in his official capacity. Hereinafter, references to defendant-appellee Woodfin implicitly include Hollomon.

Plaintiff first argues that the ordinance violates his fundamental right to travel through "public spaces," protected by the due process clause of the Fourteenth Amendment. He also argues that the ordinance denies him his constitutional freedom to intrastate travel as recognized in *Williams v. Fears*, 179 U.S. 270, 274, 45 L. Ed. 186, 188 (1900) (finding that "the right, ordinarily, of free transit from or through the territory of any state is a right secured by the 14th Amendment").

Substantive due process is not a blanket protection. In *Doe v. City of Lafayette, Ind.*, the United States Court of Appeals for the Seventh Circuit found that the right to enter public parks for "innocent, recreational purposes" is not a fundamental right. 377 F.3d 757, 771 (7th Cir. 2004).

In *Willis v. Town of Marshall, N.C.*, the United States Court of Appeals for the Fourth Circuit noted the division on the issue of whether intrastate travel is a fundamental right, but did not reach a conclusion. 426 F.3d 251, 265 (4th Cir. 2005) (comparing *Lutz v. City of York*, 899 F.2d 255, 259-68 (3d Cir. 1990) in which intrastate travel is a recognized fundamental right, with *Doe*, 377 F.3d at 770-71, which rejects sex offenders' claim to a fundamental right to access public parks). However, the *Willis* court points to the general rule that courts "must be reluctant to expand the concept of substantive due process because guideposts . . . in this uncharted area are scarce and open-ended," and courts run the risk of turning the due process clause into a personal preference policy instrument for judges. *Willis*, 426 F.3d at 266-67 (quotations and citations omitted).

The right to intrastate travel is a "right of function." *Johnson v. City of Cincinnati*, 310 F.3d 484, 498 (6th Cir. 2002). We therefore hold that the right to enter parks is not encompassed by either the fundamental right of travel or the right to intrastate travel. The ordinance does not infringe upon plaintiff's fundamental right to intrastate travel because it does not impair his daily functions. The ordinance does not prevent plaintiff from enjoying the open air with his mother and his friends in other locations if he so desires: it is restrictive only as to defendant's public parks.

Plaintiff further argues that the ordinance is not rationally related to a legitimate government interest and thus violates his substantive due process rights. He claims that although the intent of the ordinance is to protect *children* who use Woodfin's park system, the ordinance prohibits *all* registered sex offenders from entering

those parks. The town minutes from a meeting to consider the ordinance recognize child safety as one of the concerns, but do not definitively point to the safety of children as the main purpose of the ordinance. Plaintiff argues that he has never committed a crime against a child, nor has he been accused of engaging in any kind of indecent behavior directed at a child or anyone else while visiting any park in Woodfin.

"[N]arrow tailoring is required only when fundamental rights are involved. The impairment of a lesser interest . . . demands no more than a 'reasonable fit' between governmental purpose . . . and the means chosen to advance that purpose." *Reno v. Flores*, 507 U.S. 292, 305, 123 L. Ed. 2d 1, 18 (1993). Substantive due process serves to protect individuals from arbitrary government actions that lack "reasonable justification in the service of a legitimate government objective." *Dobrowolska v. Wall*, 138 N.C. App. 1, 14, 530 S.E.2d 590, 599 (2000) (quotations and citation omitted).

In *State v. Stewart*, this Court found overbroad a North Carolina law prohibiting motorists from shining light into the area past a roadway during certain hours, effectively prohibiting cars from having their headlights on during those times. 40 N.C. App. 693, 696-97, 253 S.E.2d 638, 640-41 (1979). The law constituted an "arbitrary interference with otherwise innocent conduct and lack[ed] any rational . . . relation to the . . . general welfare." *Id.* at 697, 253 S.E.2d at 641. Having found the law overbroad, this Court did not consider whether or not intrastate travel was a fundamental right. *Id.* at 698, 253 S.E.2d at 641.

Plaintiff's assertion that the intended purpose of the ordinance is the protection of children is tenuous. The text of the resolution adopting the ordinance suggests a broader reach:

Whereas the Town of Woodfin maintains a park system that is meant for the peaceful enjoyment of children and *other citizens*, and;

Whereas it is in the interest of promoting the general welfare and safety of the people of Woodfin . . . .

Thus, plaintiff's claim that the ordinance was intended only to protect children is unpersuasive. Even if we were to find that the right to access public parks is a fundamental right, which we expressly decline to do, the ordinance is rationally related to the legitimate government interest it aims to address.

The United States Supreme Court has specifically recognized the inherent danger of reintegrating sex offenders into society. In *Conn. Dep't of Pub. Safety v. Doe*, the Court stated that "[s]ex offenders are a serious threat in this Nation. The victims of sex assault are most often juveniles, and when convicted sex offenders reenter society, they are much more likely than any other type of offender to be re-arrested for a new rape or sex assault." 538 U.S. 1, 4, 155 L. Ed. 2d 98, 103 (2003) (quotations and citations omitted).

By restricting only registered sex offenders from entering public parks, which are frequented by children and other citizens, the ordinance promotes the general welfare and safety of Woodfin's citizens, which is a legitimate government purpose. Thus, we find the ordinance to be rationally related to a legitimate government purpose.

Plaintiff next argues that the ordinance is punitive in a way that would violate the *ex post facto* clause, and relies on the five-part test adopted in *Smith v. Doe*: (1) whether it "promotes the traditional aims of punishment"; (2) whether the law was "regarded in history and tradition as punishment"; (3) whether it "imposes an affirmative disability or restraint"; (4) whether it "has a rational connection to a nonpunitive purpose"; or (5) whether it "is excessive with respect to [that] purpose." *Smith v. Doe*, 538 U.S. 84, 97, 155 L. Ed. 2d 164, 180 (2003) (citing *Kennedy v. Mendoza-Martinez*, 372 U.S. 144, 168-69, 9 L. Ed. 2d 644, 661 (1963) (considering two additional factors not considered in *Smith*)).

The *Mendoza-Martinez* factors should only be used in the absence of conclusive evidence of legislative intent. *Mendoza-Martinez*, 372 U.S. at 169. 9 L. Ed. 2d at 661. "[W]e will reject the legislature's manifest intent only where a party challenging the statute provides the clearest proof that the statutory scheme is so punitive either in purpose or effect as to negate the State's intention." *Kansas v. Hendricks*, 521 U.S. 346, 361, 138 L. Ed. 2d 501, 515 (1997) (internal quotations, citations, and alterations omitted). As previously noted, the town meeting minutes reveal a non-punitive intention to maintain the parks for the enjoyment and safety of the people of Woodfin.

Plaintiff argues that despite its lack of punitive intent, the ordinance is punitive in effect. Plaintiff focuses mainly on the assertion that the ordinance promotes deterrence and retribution. He also argues that the ordinance has the effect of banishing him from public spaces, which he argues has been traditionally regarded as punishment throughout history. However, the case upon which he relies

for this assertion refers to banishment in terms of "forfeiture of citizenship," which is not at issue here. *See Mendoza-Martinez*, 372 U.S. at 168 n.23, 9 L. Ed. 2d at 661.

Plaintiff also reiterates that the ordinance is not narrowly tailored to serve its nonpunitive purpose. He reasons that it could create a false sense of security because children may be molested by someone that they know. However, in *Smith*, the Supreme Court found that "[a] statute is not deemed punitive simply because it lacks a close or perfect fit with the nonpunitive aims it seeks to advance." *Smith*, 538 U.S. at 103, 155 L. Ed. 2d at 183 (finding that a statute requiring registration of sex offenders was nonpunitive, serving the purpose of public safety).

Restrictions on a person's activities may be imposed without being punitive. The ordinance does not subject registered sex offenders to affirmative disability or restraint; they may still travel freely and attend to their daily functions. Thus, plaintiff's arguments that the ordinance is punitive in effect are not convincing. The ordinance, being neither punitive in intent nor effect, does not violate the *ex post facto* clause.

"The police power of the State is broad enough to sustain the promulgation and fair enforcement of laws designed to restore the right of safe travel by temporarily restricting all travel, other than necessary movement reasonably excepted from the prohibition." *State v. Dobbins*, 277 N.C. 484, 499, 178 S.E.2d 449, 458 (1971). This police power "extends to all the compelling needs of the public health, safety, morals and general welfare." *Id.* at 497, 178 S.E.2d at 457. Though a city does not have inherent police power, this power is delegated by statute to cities in North Carolina: "A city may by ordinance define, prohibit, regulate, or abate acts . . . detrimental to the health, safety, or welfare of its citizens . . . ." N.C. Gen. Stat. § 160A-174 (2005). This Court has held that municipalities may regulate within their boundaries for the purpose of protecting public property. *Slavin v. Town of Oak Island*, 160 N.C. App. 57, 60, 584 S.E.2d 100, 102 (2003); *see also Euclid v. Amber Realty*, 272 U.S. 364, 395, 71 L. Ed. 303, 314 (1926) ("[B]efore the ordinance can be declared unconstitutional, that such provisions are clearly arbitrary and unreasonable, having no substantial relation to the public health, safety, morals, or general welfare.") (citations omitted).

The North Carolina Supreme Court held in *Dobbins* that although individuals have "the right to travel upon the public streets of a city"

STANDLEY v. TOWN OF WOODFIN

[186 N.C. App. 134 (2007)]

as protected by the due process clause, this freedom may be regulated "when reasonably deemed necessary to the public safety, by laws reasonably adapted to the attainment of that objective." *Dobbins*, 277 N.C. at 497, 178 S.E.2d 456. The Court balances the police power of the State with the right to travel

> by the process of locating many separate points on either side of the line. So long as this Court sits, it will be engaged in that process, but it is not necessary or appropriate in the present instance to attempt to draw sharply, throughout its entire length, the line between the right of the individual to travel and the authority of the State to limit travel.

*Id.* at 497-98, 178 S.E.2d 457. Here, as in *Dobbins*, the ordinance falls on the side of a reasonable restriction.

We also note that "[a] facial challenge to a legislative Act is . . . the most difficult challenge to mount successfully." *United States v. Salerno*, 481 U.S. 739, 745, 95 L. Ed. 2d 697, 707 (1987). "The presumption is that any act passed by the legislature is constitutional, and the court will not strike it down if [it] can be upheld on any reasonable ground." *Ramsey v. Veterans Commission*, 261 N.C. 645, 647, 135 S.E.2d 659, 661 (1964). Similarly, "[a] municipal ordinance is presumed to be valid . . . ." *Currituck County v. Willey*, 46 N.C. App. 835, 836, 266 S.E.2d 52, 53 (quotations and citation omitted).

"[T]he burden is upon the complaining party to show its invalidity or inapplicability. And a municipal ordinance promulgated in the exercise of the police power will not be declared unconstitutional unless it is clearly so, and every intendment will be made to sustain it." *Id.* Plaintiff is required to show that " 'the ordinance does not rest upon any reasonable basis, but is essentially arbitrary;' and '[i]f any state of facts reasonably can be conceived that would sustain the ordinance, the existence of that state of facts at the time the ordinance was enacted must be assumed.' " *Id.* (quoting *Lindsley v. Natural Carbonic Gas Co.*, 220 U.S. 61, 78-79, 55 L. Ed. 369, 377 (1910)) (alterations omitted). Here, plaintiff has not met his burden of proof.

Because we find the ordinance to be rationally related to its intended purpose of protecting the health and safety of the citizens of Woodfin, we hold that defendant acted within its delegated police power to enact and enforce an ordinance restricting sex offenders from entering Woodfin's public parks for the purpose of promoting citizen safety.

The order of the trial court is therefore affirmed.

Affirmed.

Judge TYSON concurs.

Judge GEER dissents by separate opinion.

GEER, Judge, dissenting.

Because I cannot conclude that the trial court properly entered summary judgment upholding the Town of Woodfin's ordinance, I must respectfully dissent. N.C. Gen. Stat. § 160A-174(b) (2005) provides:

A city ordinance shall be consistent with the Constitution and laws of North Carolina and of the United States. An ordinance is not consistent with State or federal law when:

(1) The ordinance infringes a liberty guaranteed to the people by the State or federal Constitution;

. . . .

(5) The ordinance purports to regulate a field for which a State or federal statute clearly shows a legislative intent to provide a complete and integrated regulatory scheme to the exclusion of local regulation . . . .

I would hold that the Woodfin ordinance violates both N.C. Gen. Stat. § 160A-174(b)(1) and (b)(5).

### Courts' Obligation to Decline to Rule Unnecessarily Upon Constitutional Questions

As an initial matter, I recognize that plaintiff has stipulated that "[b]ut for the question concerning its constitutionality, . . . the ordinance is valid and enforceable." It is, however, a well established principle of jurisprudence that "appellate courts must 'avoid constitutional questions, even if properly presented, where a case may be resolved on other grounds.'" *James v. Bartlett*, 359 N.C. 260, 266, 607 S.E.2d 638, 642 (2005) (quoting *Anderson v. Assimos*, 356 N.C. 415, 416, 572 S.E.2d 101, 102 (2002)). *See also Brooks v. Taylor Tobacco Enterprises, Inc.*, 298 N.C. 759, 761, 260 S.E.2d 419, 421 (1979) ("It is an established principle of appellate review that this court will refrain from deciding constitutional questions when there is an alternative

ground available upon which the case may properly be decided."); *Carillon Assisted Living, LLC v. N.C. Dep't of Health and Human Servs.*, 175 N.C. App. 265, 271, 623 S.E.2d 629, 634 (declining to address dissent's constitutional argument because case could be resolved on purely statutory grounds), *disc. review denied*, 360 N.C. 531, 633 S.E.2d 676 (2006), *and appeal dismissed*, 361 N.C. 218, 641 S.E.2d 802 (2007).

This rule applies even when the parties' appeal makes only a constitutional argument. Thus, in *State v. Lueders*, 214 N.C. 558, 560, 200 S.E. 22, 23 (1938), the defendant had—not unlike Mr. Standley here—stipulated at the trial level to the facts because "[t]he purpose of [the] appeal, frankly avowed, [was] to obtain a reconsideration of [a prior Supreme Court decision] and to test again the constitutionality of [a statute]." Nonetheless, our Supreme Court declined to do so since "if a case can be decided on either of two grounds, one involving a constitutional question, the other a question of lesser moment, the latter alone will be determined [as] [i]t is not the habit of the Court to decide questions of a constitutional nature unless absolutely necessary to a decision of the case." *Id.* at 561, 200 S.E. at 23 (internal quotation marks and citation omitted).

Likewise, in *State v. Wallace*, 49 N.C. App. 475, 271 S.E.2d 760 (1980), the defendant based his appeal on his contention that a particular statute was unconstitutional on its face. This Court held:

> While defendant's argument is intriguing and unique, on the record before us we are not required to reach any constitutional question. A constitutional question will not be passed upon if there is also present some other ground upon which the case may be decided. If the case can be decided on one of two grounds, one involving a constitutional question, the other a question of lesser importance, the latter alone will be determined. The Court will not decide questions of a constitutional nature unless absolutely necessary to a decision of the case.

*Id.* at 484-85, 271 S.E.2d at 766. The Court then resolved the appeal on a non-constitutional basis because "[a]lthough counsel do not address [that] question, it arises on the face of the record." *Id.* at 485, 271 S.E.2d at 766. *See also In re Byers*, 295 N.C. 256, 259, 244 S.E.2d 665, 668 (1978) (per curiam) (although respondent only raised constitutional issue on appeal, Supreme Court determined that appeal could be resolved on nonconstitutional basis and, therefore, "deem[ed] it inappropriate to consider the constitutional issue pre-

sented by respondent's appeal"); *State v. Muse,* 219 N.C. 226, 227, 13 S.E.2d 229, 229 (1941) (although defendant, on appeal, sought to test constitutionality of act under which he was indicted, Supreme Court refused to address constitutional question because appeal could be resolved "on a question of less moment").

Here, based on these principles, I do not believe that a party should be able to effectively force a court to address a constitutional argument by stipulating that an otherwise unenforceable ordinance is enforceable. We should not leapfrog over the preliminary question of whether the Town of Woodfin had authority to adopt this ordinance in the first place simply because the parties invite us to do so. If the ordinance violates N.C. Gen. Stat. § 160A-174(b)(5), then it is "invalid and unenforceable." *Greene v. City of Winston-Salem,* 287 N.C. 66, 74, 213 S.E.2d 231, 235 (1975). *See also State v. Tenore,* 280 N.C. 238, 248, 185 S.E.2d 644, 651 (1972) (if town had no authority to adopt ordinance, it would be void, and no one could be punished for violating it).

As a result, any ruling on the constitutionality of the Town's ordinance would be unnecessary and amount merely to an advisory opinion. Yet, our appellate courts "never anticipate questions of constitutional law in advance of the necessity of deciding them, nor venture advisory opinions on constitutional questions." *Lueders,* 214 N.C. at 560, 200 S.E. at 23. *See also State v. Blackwell,* 246 N.C. 642, 644, 99 S.E.2d 867, 868 (1957) ("The constitutionality of a statute will not be considered and determined by the Court as a hypothetical question.").

Moreover, an opinion upholding the constitutionality of the ordinance would undoubtedly result in a flurry of enactments of similar ordinances across the State. Because, as I explain below, allowing municipalities and counties to adopt their own ordinances regulating sex offenders would interfere with the comprehensive state and federal legislation in this area, I do not believe we have the luxury to do as the parties urge and blithely move on to the more interesting constitutional issue.

### The Ordinance's Interference with the Comprehensive State and Federal Regulation of Sex Offenders

In *Craig v. County of Chatham,* 356 N.C. 40, 44, 565 S.E.2d 172, 175 (2002), the Supreme Court addressed N.C. Gen. Stat. § 160A-174(b)(5) and the question of how to determine whether the

General Assembly "intended to implement statewide regulation in the area, to the exclusion of local regulation." Municipalities have no inherent legislative powers, but rather "are instrumentalities of state government and possess only those powers the General Assembly has conferred upon them." *Craig*, 356 N.C. at 44, 565 S.E.2d at 175. "In determining if the General Assembly intended to provide statewide regulation to the exclusion of local regulation, we must decide if it has shown a clear legislative intent to provide such a 'complete and integrated regulatory scheme.'" *Id.* at 45, 565 S.E.2d at 176 (quoting N.C. Gen. Stat. § 160A-174(b)(5)).

In undertaking this task, it is immaterial that the General Assembly has not provided an express statement of intent. Instead, "[t]he General Assembly can create a regulatory scheme which, though not expressly exclusory, is so complete in covering the field that it is clear any regulation on the county level would be contrary to the statewide regulatory purpose." *Id.* at 46, 565 S.E.2d at 176. "[W]e must primarily look to 'the spirit of the act[] and what the act seeks to accomplish.'" *Id.* (second alteration original) (quoting *State v. Anthony*, 351 N.C. 611, 615, 528 S.E.2d 321, 323 (2000)).

In this case, we are confronted with comprehensive regulation of convicted sex offenders by both the federal government and the State of North Carolina. As our Supreme Court recently noted, Congress enacted legislation in 1994 that conditioned continued federal funding of state law enforcement on state adoption of sex offender registration laws. *State v. Bryant*, 359 N.C. 554, 559, 614 S.E.2d 479, 482 (2005). This legislation, the Jacob Wetterling Crimes Against Children and Sexually Violent Offender Registration Act ("the Jacob Wetterling Act"), Pub. L. No. 103-322, 108 Stat. 2038 (1994) (codified as amended at 42 U.S.C. § 14071 *et seq.* (2000)), also set minimum standards for the state programs. 42 U.S.C. § 14071(b). *See also Bryant*, 359 N.C. at 559, 614 S.E.2d at 482. The focus of this legislation was on statewide programs. By 1996, every state, the District of Columbia, and the federal government had enacted a sex offender registration and community notification program. *Id.*

The Jacob Wetterling Act was followed in 2006 by the Adam Walsh Child Protection and Safety Act, Pub. L. 109-248, 120 Stat. 587 (2006) (codified at 42 U.S.C. § 16901 *et seq.* (Supp. 2007)) ("the Adam Walsh Act"). The Adam Walsh Act states its purpose:

> In order to protect the public from sex offenders and offenders against children, and in response to the vicious attacks by violent

predators against the victims listed below, Congress in this Act *establishes a comprehensive national system* for the registration of those offenders.

42 U.S.C. § 16901 (emphasis added). As a condition of receiving certain law enforcement funding, 42 U.S.C. § 16925(a) (Supp. 2007), this Act imposes various obligations on "jurisdictions" with respect to convicted sex offenders. "Jurisdiction" is defined by the Act to mean the states, the District of Columbia, Puerto Rico, and various territories; it does not include local governmental bodies. 42 U.S.C. § 16911(10) (Supp. 2007).

In order to meet the Adam Walsh Act's purpose of protecting the safety of the public from sexual predators, states are required, among other things, to make registration information available to the public on websites. 42 U.S.C. § 16918(d) (Supp. 2007). They must report information regarding sex offenders to the United States Attorney General, law enforcement agencies, school and public housing agencies, social services entities, and volunteer organizations in which contact with minors or other vulnerable individuals might occur. 42 U.S.C. § 16921(b) (Supp. 2007). Compliance may, however, be excused if the United States Attorney General determines that certain provisions would place the state in violation of its own constitution, as determined by a ruling of the state's highest court. 42 U.S.C. § 16925(b)(1).

In addition, Congress has established the Sex Offender Management Assistance Program, 42 U.S.C. § 16926 (Supp. 2007), and the Office of Sex Offender Sentencing, Monitoring, Apprehending, Registering and Tracking, 42 U.S.C. § 16945 (Supp. 2007). Finally, federal regulations prohibit a family's admission to federally assisted housing if a member of the household is required to register as a sex offender on a lifetime basis. *See, e.g.*, 24 C.F.R. §§ 5.856, 882.518, 960.204, and 982.553 (Supp. 2007).

In 1995, North Carolina, consistent with the federal legislation, enacted the Amy Jackson Law, 1995 N.C. Sess. Laws ch. 545 (codified as amended at N.C. Gen. Stat. § 14-208.5 *et seq.* 2005). The General Assembly significantly amended this legislation in 2006. 2006 N.C. Sess. Laws ch. 247.

The General Assembly adopted this legislation for the following purpose:

The General Assembly recognizes that sex offenders often pose a high risk of engaging in sex offenses even after being

released from incarceration or commitment and that protection of the public from sex offenders is of paramount governmental interest.

The General Assembly also recognizes that persons who commit certain other types of offenses against minors, such as kidnapping, pose significant and unacceptable threats to the public safety and welfare of the children in this State and that the protection of those children is of great governmental interest. Further, the General Assembly recognizes that law enforcement officers' efforts to protect communities, conduct investigations, and quickly apprehend offenders who commit sex offenses or certain offenses against minors are impaired by the lack of information available to law enforcement agencies about convicted offenders who live within the agency's jurisdiction. Release of information about these offenders will further the governmental interests of public safety so long as the information released is rationally related to the furtherance of those goals.

Therefore, it is the purpose of this Article to assist law enforcement agencies' efforts to protect communities by requiring persons who are convicted of sex offenses or of certain other offenses committed against minors to register with law enforcement agencies, to require the exchange of relevant information about those offenders among law enforcement agencies, and to authorize the access to necessary and relevant information about those offenders to others as provided in this Article.

N.C. Gen. Stat. § 14-208.5 (2005). North Carolina's sex offender registration law thus has two goals: (1) to generally protect the safety of the public, and (2) to assist law enforcement agencies.

In order to accomplish these goals, the General Assembly established two registration programs, with the second more stringent program directed at recidivists and sexually violent predators. *See* N.C. Gen. Stat. § 14-208.6A (2005).[2] As our Supreme Court summarized in *Bryant,* the "North Carolina Sex Offender and Public Protection Registration Program" requires:

every individual having a reportable conviction as defined by N.C.G.S. § 14-208.6, which includes offenses against minors and

---

2. The first category has a 10-year registration requirement, while the second category requires lifetime registration. N.C. Gen. Stat. § 14-208.6A. A third program governs juveniles not tried as adults. *See* N.C. Gen. Stat. § 14-208.26 (2005). Different registration requirements apply to the juveniles, and the information is released only to law enforcement rather than the public. N.C. Gen. Stat. § 14-208.29 (2005).

STANDLEY v. TOWN OF WOODFIN

[186 N.C. App. 134 (2007)]

"sexually violent offenses," to register as a convicted sex offender with the sheriff of the county in which the person resides. N.C.G.S. § 14-208.7(a). If an individual convicted of such a crime moves to North Carolina "from outside this State, the person shall register within 10 days of establishing residence in this State, or whenever the person has been present in the State for 15 days, whichever comes first." *Id.* Additionally, non-resident workers and students who have reportable convictions or are required to register as sex offenders in their resident state must also register as a convicted sex offender in the county in which they are employed or attend school. N.C.G.S. § 14-208.7(a1).

359 N.C. at 561, 614 S.E.2d at 483-84. The legislation requires the convicted sex offender to notify the sheriff of any change of address or status. N.C. Gen. Stat. § 14-208.9 (2005). There is a semiannual verification of that information, N.C. Gen. Stat. § 14-208.9A (2005), or a 90-day verification for more serious offenders, N.C. Gen. Stat. § 14-208.24 (2005). Violations of the registration requirements constitute a Class F felony. N.C. Gen. Stat. § 14-208.11 (2005).

The sheriff is required to obtain certain information from the registering sex offenders, including a current photograph, and for recidivists and sexually violent predators, additional information such as any treatment received. N.C. Gen. Stat. §§ 14-208.7, 14-208.22 (2005). Much of this information then becomes public record and is made available over the internet. N.C. Gen. Stat. §§ 14-208.10, 14-208.14 (2005).

In addition to the registration and notification requirements, the General Assembly has imposed geographical restrictions on convicted sex offenders. Under N.C. Gen. Stat. § 14-208.16(a) (Supp. 2006), "[a] registrant under this Article shall not knowingly reside within 1,000 feet of the property on which any public or nonpublic school or child care center is located." A violation of this restriction is a Class G felony. N.C. Gen. Stat. § 14-208.16(f).[3]

Further, the General Assembly has limited the employment of convicted sex offenders and the ability of sex offenders to be in the presence of minors:

(a) It shall be unlawful for any person required to register under this Article to work for any person or as a sole proprie-

---

3. The General Assembly has also provided, however, that a landlord offering real property for rent or a person selling real property is not required to disclose that a person convicted of a crime for which registration is required resides near the property. N.C. Gen. Stat. §§ 39-50, 42-14.2 (2005).

tor, with or without compensation, at any place where a minor is present and the person's responsibilities or activities would include instruction, supervision, or care of a minor or minors.

(b) It shall be unlawful for any person to conduct any activity at his or her residence where the person:

(1) Accepts a minor or minors into his or her care or custody from another, and

(2) Knows that a person who resides at that same location is required to register under this Article.

N.C. Gen. Stat. § 14-208.17(a), (b) (Supp. 2006). A violation of these restrictions is a Class F felony. N.C. Gen. Stat. § 14-208.17(c).

Finally, the General Assembly has directed that "[t]he Department of Correction shall establish a sex offender monitoring program that uses a continuous satellite-based monitoring system" to monitor sex offenders classified as a sexually violent predator or a recidivist and sex offenders convicted of an aggravated offense as defined in N.C. Gen. Stat. § 14-208.6. N.C. Gen. Stat. § 14-208.40(a) (Supp. 2006). Monitoring shall be for the person's natural life unless the requirement is terminated pursuant to N.C. Gen. Stat. § 14-208.43(a) (Supp. 2006).[4] The monitoring must provide (1) "[t]ime-correlated and continuous tracking of the geographic location of the subject using a global positioning system based on satellite and other location tracking technology," and (2) "[r]eporting of subject's violations of prescriptive and proscriptive schedule or location requirements." N.C. Gen. Stat. § 14-208.40(c). Reporting may range from once a day to "near real-time." N.C. Gen. Stat. § 14-208.40(c)(2). A failure to enroll in this program when required to do so constitutes a Class F felony, while tampering with the monitoring device is a Class E felony. N.C. Gen. Stat. § 14-208.44 (Supp. 2006).

In conjunction with this specific program related to convicted sex offenders, the General Assembly has also set out special conditions of probation and post-release supervision for sex offenders. A defendant convicted of a reportable conviction under N.C. Gen. Stat. § 14-208.6(4) (2005) must, among other things, participate in evaluation and treatment as ordered by the court or the Post-Release Supervision and Parole Commission ("the Commission"); not reside in a household with any minor child if the offense involved evidence

---

4. Certain other offenders may be subject to a more limited time period of satellite-based monitoring. N.C. Gen. Stat. § 14-208.40(a)(2).

STANDLEY v. TOWN OF WOODFIN

[186 N.C. App. 134 (2007)]

of sexual abuse of a minor; and satisfy any other conditions determined by the court or the Commission to be reasonably related to the offender's rehabilitation or reintegration into society. N.C. Gen. Stat. §§ 15A-1343(b)(2), 15A-1368.4(b1) (2005).

In enacting their respective legislation, both Congress and our General Assembly recognized that they were required to balance the interest in public safety with individual rights that even a sex offender still possesses. Thus, Congress recognized that state constitutions might preclude some restrictions, and the General Assembly acknowledged that release of sex offender information must be "rationally related to the furtherance of [the] goals" of public safety. N.C. Gen. Stat. § 14-208.5.

As the Supreme Court stated in *Craig*, in deciding the applicability of N.C. Gen. Stat. § 160A-174(b)(5), we must "consider the breadth and scope of the applicable general statutes in determining whether the overall regulatory scheme was designed to be preemptive." 356 N.C. at 49, 565 S.E.2d at 178. Here, we have a federal program that states it is a "comprehensive national system," 42 U.S.C. § 16901, and that anticipates regulation *by the states* of convicted sex offenders. North Carolina's regulatory scheme in turn not only provides for registration and public identification of sex offenders on the internet with pictures and all pertinent information, but also restricts employment and location of residences and requires disclosure of otherwise private information to authorities. Perhaps most significantly, the legislation requires constant satellite monitoring of the most severe offenders with the result that, in North Carolina, it appears that law enforcement may track every step the sex offender takes. Moreover, courts, probation officers, and the Commission may impose further restrictions as necessary given the circumstances of the particular offender.

Local regulation would result in different regulations of sex offenders by city and by county. While the Town has chosen to bar sex offenders from parks, other local governments may bar them from libraries or other public buildings. Municipalities may attempt to impose residential or employment restrictions beyond those provided by state law or the offender's actual sentence, probation conditions, or Commission restrictions.

In holding that municipalities could not adopt their own employment discrimination ordinances, our Supreme Court noted that "[u]pholding the particularized laws in this case could lead to a balka-

nization of the state's employment discrimination laws, creating a patchwork of standards varying from county to county" with the end result a " 'conglomeration of innumerable discordant communities.' " *Williams v. Blue Cross Blue Shield of N.C.*, 357 N.C. 170, 189, 581 S.E.2d 415, 428 (2003) (quoting *Idol v. Street*, 233 N.C. 730, 732, 65 S.E.2d 313, 315 (1951)). The same would be true here.

As our Supreme Court recognized in *Bryant*, our sex offender regulatory scheme depends in part on the fact that sex offenders cannot credibly claim ignorance of the law regarding restrictions imposed upon them. 359 N.C. at 568-69, 614 S.E.2d at 488-89. With the "balkanization" of regulation that will inevitably stem from a decision upholding the ordinance in this case, it will be difficult for anyone to know what "the law" is in North Carolina regarding convicted sex offenders. Moreover, the balance of public safety versus individual rights will vary in each municipality or county. *See Craig*, 356 N.C. at 48, 565 S.E.2d at 177-78 (noting the concern that rights would vary in different counties and upset the balance reached by General Assembly between economic interests and private property rights).

Further, if local regulation is allowed, one municipality could, in effect, shift the burden and risk of sex offenders from its geographical confines to other municipalities. Indeed, in this case, with the passage of the ordinance, plaintiff began looking at parks elsewhere in Buncombe County. This factor supports precluding local regulation of convicted sex offenders.

Finally, in a dramatic intrusion on the justice system, the conditions imposed upon a sex offender *after release from custody will no longer be established by the court* in imposing his sentence or setting the conditions for probation or by the Commission. Each local government may now weigh in on the appropriate conditions to be imposed upon sex offenders within that government's jurisdiction. This cannot be the law. *See State v. Burnett*, 93 Ohio St. 3d 419, 431-32, 755 N.E.2d 857, 868 (2001) (in holding that city lacked authority to enact an ordinance barring people convicted of a drug-related offense from a specified zone, stating that "there is no authority for the proposition that a municipality may, by way of ordinance, add a penalty for violation of a *state criminal statute* that is not otherwise provided for by the General Assembly"), *cert. denied*, 535 U.S. 1034, 152 L. Ed. 2d 649, 122 S. Ct. 1790 (2002).

In short, I believe that the State's regulation of convicted sex offenders is "so comprehensive in scope that the General Assembly

STANDLEY v. TOWN OF WOODFIN

[186 N.C. App. 134 (2007)]

must have intended that [the statutes] comprise a 'complete and integrated regulatory scheme' on a statewide basis, thus leaving no room for further local regulation." *Craig*, 356 N.C. at 50, 565 S.E.2d at 179 (quoting N.C. Gen. Stat. § 160A-174(b)(5)). *See Greene*, 287 N.C. at 75-76, 213 S.E.2d at 237 (holding, based on "contextual reading of the relevant statutes," that city ordinance requiring sprinklers was "invalid and unenforceable" in light of General Assembly's legislation regarding the State Building Code). *See also Elwell v. Township of Lower*, 2006 WL 3797974, *11-13 (N.J. Super. Dec. 22, 2006) (holding that New Jersey's Megan's law, setting forth a system of registration for sex offenders, preempted town ordinance prohibiting registered sex offenders from residing or loitering within 500 feet of any school, park, playground, recreation area, or day care facility because state law constituted comprehensive legislation and uniformity is essential regarding post-conviction treatment of sex offenders). Accordingly, I would reverse the trial court's order granting summary judgment to the Town and would direct entry of summary judgment in favor of plaintiff on the grounds that the ordinance violates N.C. Gen. Stat. § 160A-174(b)(5).

## Inadequacy of Evidentiary Record Submitted on Constitutional Question

If we do not address the Town's lack of authority to adopt this ordinance, I cannot overlook the sketchiness of the record presented to the trial court and this Court with respect to the constitutional issue. Our Supreme Court has held that "constitutional analysis always requires thorough examination of all relevant facts." *Anderson*, 356 N.C. at 416, 572 S.E.2d at 102. Accordingly, "[i]f the factual record necessary for a constitutional inquiry is lacking, an appellate court should be especially mindful of the dangers inherent in the premature exercise of its jurisdiction." *Id.* at 416-17, 572 S.E.2d at 102 (internal quotation marks omitted). Even if we disregard the alternative statutory ground, I do not believe, under *Anderson*, that the factual record in this case is sufficient to resolve the constitutional issues raised by the parties.

While debating vigorously whether the ordinance is constitutional, the parties rely almost exclusively on various publications. These materials are simply included within the record on appeal unsupported by any expert testimony, such as an affidavit or a deposition. Some of the materials are printed from the internet with no explanation as to the identity of the source.

Not just any material qualifies for consideration on a motion for summary judgment. A party cannot simply submit documents supporting his or its position without considering the Rules of Evidence. It is well established that "[o]n a motion for summary judgment the court may consider evidence consisting of affidavits, depositions, answers to interrogatories, admissions, documentary materials, facts which are subject to judicial notice, *and any other materials which would be admissible in evidence at trial.*" *Huss v. Huss*, 31 N.C. App. 463, 466, 230 S.E.2d 159, 161-62 (1976) (emphasis added). *See also Kessing v. Nat'l Mortgage Corp.*, 278 N.C. 523, 533, 180 S.E.2d 823, 829 (1971) ("Evidence which may be considered under Rule 56 includes admissions in the pleadings, depositions on file, answers to Rule 33 interrogatories, admissions on file whether obtained under Rule 36 or in any other way, affidavits, and any other material which would be admissible in evidence or of which judicial notice may properly be taken."); *Deer Corp. v. Carter*, 177 N.C. App. 314, 325, 629 S.E.2d 159, 168 (2006) ("Our Supreme Court has held that in considering a Rule 56 motion for summary judgment, a trial court may consider material which would be admissible in evidence at trial." (internal quotation marks omitted)); *Chicora Country Club, Inc. v. Town of Erwin*, 128 N.C. App. 101, 111, 493 S.E.2d 797, 803 (1997) (holding that party's "attempt to amend the petition" was not material that would have been admissible in evidence and, therefore, trial court was not obliged to consider it when ruling upon motion for summary judgment).

Here, both parties blithely disregard the Rules of Evidence. Since " 'material offered which set[s] forth facts which would not be admissible in evidence should not be considered when passing on the motion for summary judgment,' " *Strickland v. Doe*, 156 N.C. App. 292, 295, 577 S.E.2d 124, 128 (quoting *Borden, Inc. v. Brower*, 17 N.C. App. 249, 253, 193 S.E.2d 751, 753, *rev'd on other grounds*, 284 N.C. 54, 199 S.E.2d 414 (1973)), *disc. review denied*, 357 N.C. 169, 581 S.E.2d 477 (2003), we—and the trial court—cannot similarly disregard the question whether these articles and internet publications would be admissible at trial. *See Smith v. Indep. Life Ins. Co.*, 43 N.C. App. 269, 276, 258 S.E.2d 864, 868 (1979) (exhibit that constituted hearsay "could not be considered by the trial court on motion for summary judgment").[5]

---

5. *But see Lindsey v. N.C. Farm Bureau Mut. Ins. Co.*, 103 N.C. App. 432, 437, 405 S.E.2d 803, 805-06 (1991) (party could not object on appeal to contents of summary judgment affidavits when party did not object to affidavits before trial court).

STANDLEY v. TOWN OF WOODFIN

[186 N.C. App. 134 (2007)]

It cannot be disputed that the parties' articles and internet materials constitute hearsay. *See* N.C.R. Evid. 801(c) (" 'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted."). Both parties have submitted these publications to prove "the facts" set forth within them. *See also Hickok v. G. D. Searle & Co.*, 496 F.2d 444, 446 (10th Cir. 1974) ("[I]t is well established that medical textbooks, treatises and professional articles are not freely admissible in evidence to prove the substantive or testimonial facts stated therein, since they are subject to the hearsay rule."); *Stang-Starr v. Byington*, 248 Neb. 103, 109, 532 N.W.2d 26, 30 (1995) ("When offered to prove the truth of matters asserted in them, learned writings, such as treatises, books, and articles regarding specialized areas of knowledge, are clearly hearsay.").

Our North Carolina appellate courts have held that such articles are admissible only under the learned treatise exception to the hearsay rule set forth in Rule 803(18). *See State v. Lovin*, 339 N.C. 695, 714, 454 S.E.2d 229, 240 (1995) (holding that because professional article was not shown to be learned treatise under N.C.R. Evid. 803(18), it was not admissible as substantive evidence); *Ferguson v. Williams*, 101 N.C. App. 265, 275, 399 S.E.2d 389, 395 (holding that excerpt from Physician's Desk Reference could be admitted only as a learned treatise), *disc. review denied*, 328 N.C. 571, 403 S.E.2d 510 (1991). Rule 803(18) provides that the following is not excluded as hearsay:

> To the extent called to the attention of an expert witness upon cross-examination or relied upon by him in direct examination, *statements contained in published treatises, periodicals, or pamphlets on a subject of history, medicine, or other science or art, established as a reliable authority by the testimony or admission of the witness or by other expert testimony or by judicial notice.* If admitted, the statements may be read into evidence but may not be received as exhibits.

(Emphasis added.) In sum, the party offering the publication must demonstrate that it is a "reliable authority" through testimony or by judicial notice.

Neither party has made any attempt to establish through testimony that the materials fall within Rule 803(18). *Compare Sterling v. Gil Soucy Trucking, Ltd.*, 146 N.C. App. 173, 179-80, 552 S.E.2d 674, 678 (2001) (holding that article was properly admitted because

expert witness testimony established article as reliable scientific authority). Nor is there any basis for a court to take judicial notice of the publications' reliability. Simply because a statistical analysis has been generated by the federal government—as is true of some of the materials—does not require the conclusion that experts in the field consider that analysis reliable or good science. Articles by the Justice Department are subject to critique by experts just like studies by scientists associated with universities or private research institutions.[6]

Alternatively, as the Tenth Circuit has pointed out, "expert witnesses are sometimes allowed to testify as to hearsay matters by discussing published materials, but this is allowed . . . solely to establish the basis for the expert's opinion, and not to establish the veracity of the hearsay matters themselves." *Hickok*, 496 F.2d at 447 (internal citation omitted). *See also* N.C.R. Evid. 703 ("The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to him at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence."); *State v. Oliver*, 85 N.C. App. 1, 13-14, 354 S.E.2d 527, 534-35 (doctor allowed to testify to body of literature accepted by her profession), *disc. review denied*, 320 N.C. 174, 358 S.E.2d 64 (1987). This Court has held, however, that a study by the American Medical Association and a press release by the North Carolina Department of Health and Human Services were not admissible in connection with a summary judgment motion when they were attached only to a lay witness' affidavit and were not relied upon for purposes of an expert opinion. *See Duncan v. Cuna Mut. Ins. Soc'y*, 171 N.C. App. 403, 408, 614 S.E.2d 592, 596 (2005). Here, we do not even have a lay witness addressing the materials.

Because of the parties' failure to establish the admissibility of these materials, they should not be considered on summary judgment. *See, e.g., Miskin v. Baxter Healthcare Corp.*, 107 F. Supp. 2d 669, 674 (D. Md. 1999) (plaintiff's failure to demonstrate that two unauthenticated medical treatises qualified as learned treatises "ma[de] the treatises unauthenticated, inadmissible hearsay, which cannot be considered during summary judgment"), *aff'd*, 213 F.3d 632 (4th Cir. 2000); *Joiner v. General Elec. Co.*, 864 F. Supp. 1310, 1317 n.14 (N.D. Ga. 1994) (when plaintiff relied upon scientific publica-

---

6. There has also been no showing that the reports from the United States Justice Department fall within N.C.R. Evid. 803(8), providing a hearsay exception for certain public records and reports.

tions to establish particular fact, but failed to present expert testimony that those materials constituted learned treatises under Rule 803(18), plaintiff failed to present admissible evidence on that point for purpose of summary judgment), *rev'd*, 78 F.3d 524 (11th Cir. 1996), *rev'd*, 522 U.S. 136, 139 L. Ed. 2d 508, 118 S. Ct. 512 (1997).

Even apart from the question of the admissibility of the materials, the lack of expert testimony is troubling. The materials contained in the record appear to represent statistical analyses and surveys of studies conducting statistical analyses. As Benjamin Disraeli, the British Prime Minister, reportedly proclaimed: "There are three kinds of lies: lies, damned lies, and statistics." The United States District Court for the District of South Carolina has stated the idea more tactfully: "It is undoubtedly true that statistical evidence is inherently malleable and subject to careful scrutiny." *Lott v. Westinghouse Savannah River Co., Inc.*, 200 F.R.D. 539, 546 (D.S.C. 2000). For that reason, the Fourth Circuit has held, with respect to employment discrimination claims, "if a plaintiff offers a statistical comparison without expert testimony as to methodology or relevance to plaintiff's claim, a judge may be justified in excluding the evidence." *Carter v. Ball*, 33 F.3d 450, 457 (4th Cir. 1994). *See also Lott*, 200 F.R.D. at 546 ("The general rule is that statistical evidence must be supported by expert testimony.").

Yet, in this case, no expert exists to address the reliability or meaning of these studies. "While all studies have flaws, some have more flaws than others. Study after study has found that many articles in the most prestigious medical journals are replete with shaky statistics and lack of any explanation of . . . critical matters . . . ." Victor Cohn, *News & Numbers: A Guide to Reporting Statistical Claims and Controversies in Health and Other Fields* 10-11 (1989).

In this case, for example, both parties rely heavily upon an article from the United States Department of Justice: Patrick A. Langan, Ph.D., Erica L. Schmitt, and Matthew R. Durose, *Recidivism of Sex Offenders Released from Prison in 1994* (Nov. 2003). The parties ask us to accept this publication's reliability and authority on faith. I cannot do that. For example, this publication claims that since no sampling was used to select sex offenders for the study, "percentages in this report for sex offenders were not subject to sampling error." *Id.* at 39. Because, however, the text admits that not all sex offenders released were used in the review and because the analysis focuses only on sex offenders released in 1994 in 15 states, there was in fact some sampling, and expert testimony is necessary to evaluate

STANDLEY v. TOWN OF WOODFIN

[186 N.C. App. 134 (2007)]

whether the publication's assertion of no sampling error is reliable. In addition, the sample of non-sex offenders used appears to be significantly larger than the total number of sex offenders reviewed—a fact that an expert witness must assess to determine whether it undermines the validity of the inferences drawn. Finally, the publication asserts broadly—and without further explanation—that "[a]ll differences discussed were statistically significant at the .05 level." *Id.* at 39. A basic principle of statistics, however, states that "*[s]tatistical significance is not the same thing as practical significance.*" David S. Moore and George P. McCabe, *Introduction to the Practice of Statistics* 474 (2d ed. 1993). There is, however, no expert witness for either party to explain the practical significance of the Justice Department report.

Certainly, the practical import of the parties' publications for the ordinance at issue in this case cannot be readily apparent to a lay person. As the United States Supreme Court has cautioned: "[S]tatistics are not irrefutable; they come in infinite variety and, like any other kind of evidence, they may be rebutted. In short, their usefulness depends on all of the surrounding facts and circumstances." *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 340, 52 L. Ed. 2d 396, 418, 97 S. Ct. 1843, 1856-57 (1977). I would hold that the evidence presented below does not answer a fundamental question: What is the significance of these materials—none of them specifically addressing an ordinance such as the one at issue—with respect to the constitutional issues at hand?

We might conjecture or assume, but those are not bases for granting summary judgment as to the constitutionality of an ordinance. Under such circumstances, our courts have required expert testimony to guide the trier of fact. *See, e.g., Anderson v. Hous. Auth. of Raleigh*, 169 N.C. App. 167, 172, 609 S.E.2d 426, 429 (2005) ("Where a layperson can do no more than speculate as to the cause of a physical condition, the medical opinion of an expert is required to show causation."); *Pitts v. Nash Day Hosp., Inc.*, 167 N.C. App. 194, 204, 605 S.E.2d 154, 160 (2004) ("Generally, expert testimony is required when the standard of care and proximate cause are matters involving highly specialized knowledge beyond that of laymen."), *aff'd per curiam*, 359 N.C. 626, 614 S.E.2d 267 (2005).

Although I have an undergraduate degree in sociology that included a strong emphasis on empirical research, I would not presume to be able to assess the scientific reliability or meaning of the limited studies presented by the parties. Nor do I have any basis for deter-

STANDLEY v. TOWN OF WOODFIN

[186 N.C. App. 134 (2007)]

mining their practical significance for the constitutional issues involved in this case. These issues are of importance to citizens everywhere. They should not be resolved on a factual record as inadequate as the one presented in this case. I would hold that the evidence submitted by both parties—for the most part inadmissible at trial—is insufficient to resolve the case on summary judgment and remand for further proceedings during which the parties can build a proper record. In this appeal, we are presented with precisely the "dangers" of which the Supreme Court warned in *Anderson*.

### On the Current Record, the Ordinance Cannot Survive Strict Scrutiny

In any event, I cannot agree with the majority opinion's analysis of the constitutional issues. Mr. Standley initially argues that the ordinance violates his right to travel. While courts across the country have split on the question whether the right to engage in intrastate travel is a fundamental constitutional right, the North Carolina Supreme Court has already answered that question.

In *State v. Dobbins*, 277 N.C. 484, 496, 178 S.E.2d 449, 456 (1971), our Supreme Court considered a curfew imposed by the City of Asheville when it "was faced with an imminent threat of widespread burning and other destruction of property, public and private." The Court specifically held that "the right to travel upon the public streets of a city is a part of every individual's liberty, protected by the Due Process Clause of the Fourteenth Amendment to the United States Constitution and by the Law of the Land Clause, Article I, § 17, of the Constitution of North Carolina." *Id.* at 497, 178 S.E.2d at 456. *See also id.* at 497, 178 S.E.2d at 457 (holding that the principles governing international travel "apply also to the effect of the Fourteenth Amendment upon state imposed restraints on intracity travel").

Curiously, the majority does not address *Dobbins* in discussing Mr. Standley's substantive due process claim, but rather relies on decisions from other jurisdictions. Only the Supreme Court, however, may overrule its own decisions.

The Town, on the other hand, suggests that *Dobbins* should be limited to public streets. Public parks are, however, frequently the heart of our communities and cannot reasonably be separated from other walkways. As the United States Supreme Court stated in *Hague v. Comm. for Indus. Org.*, 307 U.S. 496, 83 L. Ed. 1423, 59 S. Ct. 954 (1939), in striking down an ordinance:

Wherever the title of streets and parks may rest, they have immemorially been held in trust for the use of the public and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions. Such use of the streets and public places has, from ancient times, been a part of the privileges, immunities, rights, and liberties of citizens. The privilege of a citizen of the United States to use the streets and parks for communication of views on national questions may be regulated in the interest of all; it is not absolute, but relative, and must be exercised in subordination to the general comfort and convenience, and in consonance with peace and good order; but it must not, in the guise of regulation, be abridged or denied.

*Id.* at 515-16, 83 L. Ed. at 1436-37, 59 S. Ct. at 964. I can perceive no basis for holding that *Dobbins* does not apply to city parks as well as city streets.

The Town also argues that no "travel" is implicated because persons are not likely to be walking through the parks to get from one place to another. I know of no authority that supports such a limited view of "travel." Indeed, as the Sixth Circuit has held, the right to travel locally "is fundamentally one of access." *Johnson v. City of Cincinnati*, 310 F.3d 484, 495 (6th Cir. 2002), *cert. denied*, 539 U.S. 915, 156 L. Ed. 2d 130, 123 S. Ct. 2276 (2003). The Ohio Supreme Court has explained:

Every citizen of this state, much like the citizens of this Nation, enjoys the freedom of mobility not only to cross our borders into our sister states, but *also to roam about innocently in the wide-open spaces of our state parks* or through the streets and sidewalks of our most populous cities. This freedom of mobility is a tradition extending back to when the first settler crossed into what would eventually become this great state, and it is a tradition no Ohioan would freely relinquish.

*Burnett*, 93 Ohio St. 3d at 428, 755 N.E.2d at 865 (emphasis added). Mr. Standley, who is disabled, has been denied his access to the Town's parks and has been prohibited from "roam[ing] innocently," *id.*, through those parks accompanied by his mother. The ordinance, therefore, implicates his fundamental right to travel.

In *Dobbins*, the Supreme Court confirmed that it is for the courts to determine "the line between the right of the individual to travel

and the authority of the State to limit travel." 277 N.C. at 498, 178 S.E.2d at 457. The Court acknowledged that the right to intracity travel "may be regulated, as to the time and manner of its exercise, when reasonably deemed necessary to the public safety, by laws reasonably adapted to the attainment of that objective." *Id.* at 497, 178 S.E.2d at 456. Nevertheless, "the right to travel on the public streets *is a fundamental segment of liberty* and, of course, the absolute prohibition of such travel requires substantially more justification than the regulation of it by traffic lights and rules of the road." *Id.* at 499, 178 S.E.2d at 457-58 (emphasis added).

'The ordinance at issue in this case is not a mere time and manner regulation of the right to travel, but rather is an "absolute prohibition" against registered sex offenders traveling into town parks. The question is not, therefore, whether the ordinance is "reasonably deemed necessary to the public safety." *Id.* at 497, 178 S.E.2d at 456. Instead, we must apply strict scrutiny in reviewing the ordinance. "Ordinarily, where a fundamental liberty interest protected by the substantive due process component of the Fourteenth Amendment is involved, the government cannot infringe on that right 'unless the infringement is narrowly tailored to serve a compelling state interest.' " *Johnson,* 310 F.3d at 502 (quoting *Washington v. Glucksberg,* 521 U.S. 702, 721, 138 L. Ed. 2d 772, 788, 117 S. Ct. 2258, 2268 (1997)). *See also Yeakle v. City of Portland,* 322 F. Supp. 2d 1119, 1128 (D. Or. 2004) ("Where an ordinance impairs a fundamental right, in order to pass constitutional muster, the government's objective must be compelling and the relation between that objective and the means must be necessary."); *Burnett,* 93 Ohio St. 3d at 428, 755 N.E.2d at 865-66 ("Any deprivation of the right to travel, therefore, must be evaluated under a compelling-interest test. Accordingly, the legislation must be narrowly tailored to serve a compelling governmental interest." (internal citation omitted)).

Here, Mr. Standley does not dispute that the Town has a compelling interest in ensuring the safety of its citizens from sexual predators. The question before this Court is whether the record establishes that the ordinance is narrowly tailored to serve that interest. The record, however, contains no evidence at all supporting this second prong.

The Town relies exclusively on a single point: that there is evidence that sex offenders have a higher rate of recidivism and are more likely to commit another sex offense than non-sex offenders. The Town proclaims that sex offenders are "four times" as likely to

commit another sex offense than a non-sex offender. It then contends that it adopted the ordinance in order to protect the public in light of this substantial risk from sex offenders. There is, however, a glaring gap in the Town's argument and proof.

The record contains no evidence that this particular ordinance serves that interest of protecting the public. The Town admits that no sex offenses committed by a registered sex offender have occurred in any of its parks.[7] In addition, the Town has presented no evidence that sex offenses are likely to occur in parks. Indeed, the only evidence in the record on this point is contrary to the need for the Town's ordinance. In another United States Department of Justice report—Lawrence A. Greenfield, *Sex Offenses and Offenders: An Analysis of Data on Rape and Sexual Assault*, U.S. Department of Justice (Feb. 1997)—the Bureau of Justice Statistics reported that "[n]early 6 out of 10 rape/sexual assault incidents were reported by victims to have occurred in their own home or at the home of a friend." *Id.* at 3. Another 10% of victims stated the crime occurred on a street away from home and 7.3% identified the site of the crime as a parking lot/garage. Parks were not separated out, but "[a]ll other locations" accounted for only 26.1% of the victimizations. *Id.* at 34. The record contains no evidence at all that sex offenses occur in parks with sufficient frequency to render the ban in this case an effective means of protection from sexual predators.

In addition, the same report states that "[a]bout two-thirds of rapes/sexual assaults were found to occur during the 12 hours from 6 p.m. to 6 a.m." *Id.* at 3. Only 33% occurred between the hours of 6:00 a.m. to 6:00 p.m. *Id.* Significantly, the parties have stipulated that the park at issue in this case opens at sunrise and closes at sunset. The Town's evidence thus establishes that roughly one-third of rapes and sexual assaults occur during this time frame. When this evidence is considered in conjunction with the Town's evidence that only some very small unspecified percentage of rapes/sexual assaults occur in parks, then there is no intellectually honest basis for stating that the Town's ban on access to parks bears any significant relationship to the protection of citizens from sexual predators. *See Waters v. Barry*, 711 F. Supp. 1125, 1139 (D.D.C. 1989) (in holding juvenile curfew unconstitutional, pointing out that the record indicated that curfew bore "little relation to the nature of the problem," since evidence showed that half of juvenile homicides occurred during non-curfew

---

7. One sexual crime did occur in a park, but the offender apparently was not registered. Thus, the ordinance would not have prevented that crime.

STANDLEY v. TOWN OF WOODFIN

[186 N.C. App. 134 (2007)]

hours and half occurred in juvenile's home, suggesting that measures such as the curfew "are simply not so closely related to the protection of minors, or to curing the city's problems with drugs and violence, as to justify the infringement of constitutional interests").

With respect to the efficacy of a park ban, the Town has not pointed to national statistics, the experiences of other municipalities, or even anecdotal evidence, such as the high profile cases reported in the media.[8] *Compare Nunez v. City of San Diego*, 114 F.3d 935, 947-48 (9th Cir. 1997) (city presented several statistical reports demonstrating that juvenile curfew is a solution to rising juvenile crime and victimization). Further, the scary "four times as likely" to re-offend statistic that forms the entire basis for the Town's argument provides no support for the ordinance when actually examined. That figure comes from the *Recidivism of Sex Offenders Released from Prison in 1994* publication prepared by the U.S. Department of Justice Bureau of Justice Statistics. That report reviewed data relating to the recidivism of sex offenders released from state prisons in 15 states, including North Carolina, of which there were 9,691. Langan, *supra* at 1. During the same time frame, the 15 states released a total of 272,111 prisoners altogether. *Id.*

The portion of the report relied upon by the Town states in full:

Compared to non-sex offenders released from State prisons, released sex offenders were 4 times more likely to be rearrested for a sex crime. Within the first 3 years following their release from prison in 1994, 5.3% *(517 of the 9,691)* of released sex offenders were rearrested for a sex crime. The rate for the 262,420 released non-sex offenders was lower, 1.3% *(3,328 of 262,420)*.

*Id.* (emphasis added). As discussed above, the practical significance of these results should be addressed in the first instance by expert testimony. Nevertheless, it still appears that, since there are far more non-sex offenders than there are sex offenders and the percentages are so very low, of the few sex offenses that might occur in one of the Town's parks, the offender would more likely be not registered as a sex offender. There were only 517 released sex offenders committing a sex crime while there were 3,328 non-sex offenders committing a sex crime. *Indeed, if we accept the Town's flawed analysis, we could boldly assert—although statisticians would surely cringe—that it*

---

8. I am not, however, suggesting that such media reports would necessarily meet the constitutional standard.

*is six times more likely* that *a given sexual assault would be committed by a non-sex offender.* Of course, this highlights yet again the need for expert testimony.

The parties have submitted 204 pages of publications. I have reviewed every single page. Nowhere is there even a hint or suggestion that barring registered sex offenders from parks would protect the public's safety to any significant extent. "To be narrowly tailored, there must be an evidentiary nexus between a law's purpose and effect." *State v. J.D.*, 86 Wash. App. 501, 508, 937 P.2d 630, 634 (1997) (striking down curfew ordinance when record failed to show any nexus between curfew and juvenile crime rates). *See also Ass'n for Advancement of the Mentally Handicapped, Inc. v. City of Elizabeth*, 876 F. Supp. 614, 623 (D.N.J. 1994) (ordinance not justified even though it was directed at protecting community from harm because conditions in ordinance did not serve that interest in theory and in practice). The record in this case shows no evidentiary basis for concluding that the ordinance will have the effect of advancing the goal of protecting citizens from sexual predators.

I find the reasoning of the Sixth Circuit in *Johnson* and the Ohio Supreme Court in *Burnett* compelling. Each case considered Cincinnati's ordinance excluding people convicted of drug offenses from entering areas designated as drug-free zones. After holding that the City had a compelling interest in reducing drug abuse and drug-related crime—an interest comparable to the one at issue in this case—the Sixth Circuit concluded that the City had failed to present evidence that its ordinance was narrowly tailored to serve that interest. *Johnson*, 310 F.3d at 505. The Court pointed out that the ordinance excluded a person "without any particularized finding that [he or she] is likely to engage in recidivist drug activity" in the drug-free zone and prohibited that person "from engaging in an array of . . . wholly innocent conduct . . . ." *Id.* at 503. To support this exclusion, the City "relie[d] on only general evidence that individuals arrested and/or convicted for drug activity in [the drug-free zone] typically return to the neighborhood and repeat their offenses." *Id.* In short, Cincinnati defended its exclusionary ordinance on the same basis that the Town does here.

The Sixth Circuit acknowledged that "[w]e, of course, 'do not demand of legislatures scientifically certain criteria of legislation.'" *Id.* at 504 (quoting *Ginsburg v. New York*, 390 U.S. 629, 642-43, 20 L. Ed. 2d 195, 205-06, 88 S. Ct. 1274, 1282 (1968)). Nevertheless, "when constitutional rights are at issue, strict scrutiny requires legislative

STANDLEY v. TOWN OF WOODFIN

[186 N.C. App. 134 (2007)]

clarity and evidence demonstrating the ineffectiveness of proposed alternatives." *Id.* The court stressed: "In considering whether a government regulation is narrowly tailored, it is not enough that the regulation achieves its ostensible purpose, it must do so without unnecessarily infringing upon constitutionally protected rights." *Id.* After noting that the city had only made conclusory claims that other efforts at battling drug crime were unsuccessful, the court concluded:

> It is, of course, possible that a regulation like the Ordinance might be the narrowest method of addressing a seemingly uncontrollable drug and crime epidemic. But without some affirmative evidence that there is no less severe alternative, we cannot conclude that the Ordinance, in its present form, survives constitutional scrutiny.

*Id.* at 505.

The Ohio Supreme Court similarly pointed out that the ordinance "encroaches upon a substantial amount of innocent conduct and is not, therefore, narrowly tailored." *Burnett*, 93 Ohio St. 3d at 430, 755 N.E.2d at 867. After reciting a number of innocent activities which were, as a result, now forbidden with respect to the people excluded from the drug-free zone, the court observed: "None of these activities are performed with illegal intention, yet a criminal penalty attaches to them without any evidence of illegality, or improper purpose, or a finding that the person is likely to commit future drug offenses." *Id.* The court, therefore, held that while supported by a compelling interest, the ordinance was not narrowly tailored to address that interest since "[a] narrowly tailored ordinance would not strike at an evil with such force that constitutionally protected conduct is harmed along with unprotected conduct." *Id.*

Here, even if we could assume that Woodfin's ordinance might, to some limited extent, achieve its purpose of protecting its citizens from sexual predators, there has been even less of a showing of narrow tailoring than that presented by Cincinnati. The ordinance precludes registered sex offenders from engaging in a host of innocent activities, some of which would be entitled to their own constitutional protection, such as First Amendment activities or assembling with the public in a park for the Town's Labor Day festivities. In contrast to Cincinnati, the Town here makes no attempt to argue that other alternative, less restrictive means would be ineffective to meet its interest in public safety. Indeed, the record contains no evidence that other alternatives were considered at any time.

Other alternatives do in fact exist. For example, the Town could ban individual sex offenders based on conduct suggesting a risk of re-offending in the park. *See, e.g., Brown v. City of Michigan City*, 462 F.3d 720, 734 (7th Cir. 2006) (banning specific sex offender from park when he had been witnessed watching patrons of park through binoculars); *Doe v. City of Lafayette*, 377 F.3d 757, 773 (7th Cir. 2004) ("The City has banned only one child sex offender, Mr. Doe, from the parks, and they have banned Mr. Doe only because of his near-relapse in January of 2000 . . . ."). The Town has also not considered the possibility of requiring a permit for registered sex offenders to enter the parks; of banning only those sex offenders most likely to re-offend, such as those required to register under the North Carolina Sexually Violent Predator Registration Program; of banning only persons convicted of certain types of sexual offenses; or of limiting the ban only to parks frequented by unaccompanied minors.[9] Each of these options would be less restrictive than the comprehensive ban adopted by the Town.[10]

Thus, there is no basis in the record for concluding that this ordinance is narrowly tailored to serve the Town's compelling governmental interest. *See Waters*, 711 F. Supp. at 1140 (in striking down juvenile curfew adopted to prevent crime, holding that "[b]ecause neither logic or [sic] the record permit the conclusion that the classification contained in the Act is narrowly tailored to achieve its expressed objectives, the Court concludes that the Act violates the equal protection component of the Fifth Amendment"). Even under a rational basis analysis, "vague, undifferentiated fears" regarding a particular group cannot support an ordinance. *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 449, 87 L. Ed. 2d 313, 326, 105 S. Ct. 3249, 3259 (1985) (discussing ordinance as related to the mentally retarded).

We cannot simply say that conventional wisdom or commonsense suggests that the ordinance is needed. Not infrequently, the genesis of widely-held beliefs is fear not grounded in reality or science, but rather propogated by collective terror fueled by television or the internet. We cannot strip a whole group of people of a fundamental

9. It has been stipulated that the park visited by Mr. Standley and his mother contains no amenities for children.

10. I do not intend, by mentioning these options, to express an opinion on their constitutionality since the parties have not had an opportunity to address that question. I am simply demonstrating that options do exist that the Town could have considered. Its failure to consider any other option renders its ordinance constitutionally suspect.

right based not on their individual behavior, but rather based simply on a desire to be seen as taking action to respond to the public's fear—especially when there is only the "belief" that such action might possibly make the community a little bit safer. If the record in this case is sufficient to uphold the Town's ordinance, we are indeed confronted with a slippery slope. Will municipalities next be allowed to bar other groups feared at times by the public—such as the mentally ill or handicapped, the homeless, gays, or people of middle eastern descent—because of the possibility that some individual members of those groups might in the future engage in unlawful conduct?

Nothing in *Dobbins* suggests that the ordinance is constitutional. The Supreme Court stressed: "We do not have before us a prolonged curfew, imposed by an unduly fearful or arbitrary official upon a serene and peaceful city engaged in its normal pursuits. We have before us a temporary prohibition of travel in a city faced with a clear and present danger of violent upheaval, accompanied by widespread destruction of property and personal injury." 277 N.C. at 499, 178 S.E.2d at 458. The Court noted that the state and federal constitutions did not require the City of Asheville to wait to act until fires had been ignited and rioting commenced. *Id.* at 500, 178 S.E.2d at 458. Instead, "[a]ll that is required is the existence of a clear and present danger of such disastrous and unlawful conduct." *Id.* Because, "according to the record before" the Court, that condition existed in Asheville at the time the curfew was proclaimed, the Court found the curfew constitutional. *Id. Dobbins* thus teaches that the record must demonstrate that there was, at the time the ordinance was adopted, a "clear and present danger" that a registered sex offender would re-offend in one of the Town's parks. No such evidence exists.

The fact that we are talking about convicted sex offenders does not negate constitutional principles. Our Supreme Court, acting 75 years ago, struck down an ordinance that prohibited "any lewd woman" from being on the public streets, in public places, or places of business. *See State v. Ashe*, 202 N.C. 75, 75, 161 S.E. 709, 709 (1932). In holding the ordinance unconstitutional, the Court stated:

> However much they may have offended against the decencies of society, or run counter to the prevailing code of morals, or rendered themselves *non grata personae* to the community, still they are human beings, citizens of a great Commonwealth, and entitled to the equal protection of the laws.

*To deny to anyone, not lawfully imprisoned, the right to travel the highways,* to buy goods, to eat bread, to attend Divine Worship, and the like, *simply because he or she happens, for the time being, to belong to an unfortunate class, is an unwarranted use of the police power.* Such an attempt at discrimination is unreasonable and in contravention of common right.

*Id.* at 76, 161 S.E. at 710 (emphasis added) (internal citation omitted). Surely, we have not—75 years later—so strayed from the groundings of our constitution that *Ashe's* view of what is an "unwarranted use of the police power" with respect to "lewd women" does not apply with equal force to sex offenders, the vast majority of whom will not re-offend.

Conclusion

The issue in this case is not whether sexual predators present a risk to our communities. They do. Nor is there any doubt about the ability of state and federal legislatures to act to protect their citizens from such predators. The primary question before this Court is whether the Town has the authority to impose its own regulatory scheme despite the comprehensive state and federal legislation adopted to serve the same purposes. Even if authority does exist, the question remains whether the means used by the Town is sufficiently necessary and tailored to override the rights of people who have already been punished for their crimes, who wish to engage in the innocent behavior of strolling through a park, and who have exhibited no behavior suggesting they will ever offend again.

A municipality should not be permitted to override fundamental constitutional rights based only on *perceived exigency,* without consideration of alternatives or efficacy. The public will believe itself safe, although it is not, and people who will never re-offend will be deprived of a fundamental right. I am confident we will come to regret allowing such action to be undertaken in the name of political expediency.